JOSHUA ALLEN and others, petitioners in equity, *vs.* INHABITANTS of JAY and others.

*Towns not constitutionally authorized to loan credit to individuals to engage in manufacturing.*

The legislature cannot constitutionally authorize towns to loan their credit to such persons as, in consideration thereof, will engage therein in manufacturing for their private emolument.

Thus the defendant town, at a meeting legally called therefor, voted to loan its credit to Hutchings & Lane, to the amount of ten thousand dollars, at six per cent annually, issue its bonds therefor, and exempt H. & L.'s mill and lumber from taxation for ten years, provided H. & L. would invest twelve to thirteen thousand dollars, at or near Jay Bridge, in building a steam saw-mill with box machinery, and in putting in one run of stones for grinding meal; keep the same in good repair, and amply insured; secure the town by mortgage on the property, at the rate of one dollar for every seventy-five cents thus loaned, and pay all interest, and ten per cent on the principal annually, after three

years; and carry on said manufacturing business not less than ten years. Thereupon the legislature enacted, that, whereas, upon due investigation and consideration, we deem it for the benefit of the town of Jay, and of the people of this State, said town is hereby authorized to loan the sum of ten thousand dollars to Hutchings & Lane, in accordance with a vote taken by said town for the encouragement of manufactures in said town. On petition for injunction, *Held,* that the act of the legislature is unconstitutional; and that the respondents be perpetually enjoined from issuing the bonds.

It is for the court, and not the legislature, to determine whether the use for which private property is taken, in a given case, is or is not a public use.

ON PETITION by Joshua Allen and nine other taxable inhabitants of the town of Jay, against the inhabitants of the town, and Rodolphus P. Thompson, John Hanson, and Warren Leland, selectmen of the town.

The petition alleges substantially,—

That the petitioners are taxable inhabitants of Jay; that the town, on April 21, 1870, at a legal meeting called therefor, passed the following vote (see opinion); that so much of the vote as assumes to authorize the town to loan its credit for the amount and purpose, and upon the conditions therein named, and the authority assumed thereby to be conferred upon the selectmen of Jay, to issue bonds in the manner and for the purposes indicated in said vote, were and are without authority of law, the town having no legal right or power to authorize the acts complained of, and which, if done, will be in derogation of the rights of the petitioners and other tax-payers in town; and that the petitioners are informed and believe it to be the intention of the selectmen named to issue the bonds, under the vote, to the amount of $10,000 to said Hutchings and Lane, in accordance with the vote.

And they pray that the selectmen named, and their successors, be enjoined from issuing or negotiating such bonds, for the purposes and to the uses named or contemplated in said vote, and that the inhabitants and their officers and servants be alike enjoined,—and for process.

On March 2, 1871, notice was ordered upon the respondents returnable on March 11, to be heard by the judge who should preside at the March term in this county, the hearing to be whether or not

a temporary injunction should issue.   At the hearing. a temporary injunction was granted.   Thereupon it was agreed to submit the case to the  law court, upon the facts  stated, together with Private Laws of 1871, c. 716.   And if  the complainants were entitled to the relief  claimed, the court to issue the proper  decree.

*Robert Goodenow*, for the petitioners.

*S. Belcher*, for the respondents.

APPLETON,  C.  J.   A town  meeting of  the inhabitants of  Jay was duly called to see if the town would loan its credit to Hutchins & Lane, on certain terms, provided ' said Hutchins & Lane shall move their new saw-mill  and  box factory from Livermore Falls to Jay Bridge, and also  put in operation  one run of  stones for grinding meal, and establish their manufacturing  business as soon as the month of  September, A. D. 1870, at or near Jay Bridge.'

At a legal meeting held upon this call on April 19th, and by adjournment on April 21, 1870, the town ' voted to loan their credit to the amount of  ten thousand dollars, at six per cent  annually, to H. W. Hutchins and B. R. Lane, provided said Hutchins & Lane will  invest the amount of from twelve to thirteen thousand dollars in building a steam saw-mill, box factory machinery and land ;  also to  put in one  run of  stones for  grinding meal, to be located at or near Jay Bridge, and to keep  the above-named  property in good repair, and also  keep it amply insured, and to cause  said manufacturing  business to be carried on for a  term not less than ten years, said Hutchins & Lane to pay all  the interest, and ten per cent of the principal  annually, after  three years,' the town to be secured by a mortgage of the mill, machinery, and land, ' at the rate of one dollar for every seventy-five  cents thus  loaned by said  town, and the  selectmen  are  hereby authorized to issue town bonds for  the above amount, payable in yearly instalments after three years, at six per  cent interest annually, viz.: one thousand dollars the first year, and nine hundred dollars each year  for the ten succeeding years, providing  the whole amount  shall be  necessary to establish said manufacturing business.'

The legislature passed an act, c. 716, approved Feb. 25, 1871, in the following terms:

'Whereas, upon due investigation and consideration, we deem it for the benefit of the town of Jay, and of the people of this State, said town is hereby authorized to loan the sum of ten thousand dollars to Hutchins & Lane, in accordance with a vote taken by said town on the 21st day of April, eighteen hundred and seventy, for the encouragement of manufacturing in said town.'

The complainants, ten taxable inhabitants of Jay, under R. S. c. 77, § 5, by which this court has equity jurisdiction, 'when counties, cities, towns, or school districts, for a purpose not authorized by law, vote to pledge their credit or to raise money by taxation, or to pay money from their treasury,' have filed a bill in equity, praying that the defendants and all their officers may be enjoined from issuing certain bonds, duly described in the bill, the issue thereof, being for a purpose not authorized by law.

The purpose is obvious, and the inquiry is, whether the purpose is one authorized by law?

Whether the loan be of town bonds or of money, as, if the loan be of bonds, the town must ultimately be liable for their payment, and as the payment is to be raised by taxation, matters not. The question proposed is whether the legislature can authorize towns to raise money by taxation, for the purpose of loaning the money so raised to such borrowers as may promise to engage in manufacturing or any other business the town may prefer, for their private gain and emolument. Is the raising of money to loan to such persons as the town may determine upon as borrowers, a legal exercise of the power of taxation? Ultimately, it will be found that the question resolves itself into an inquiry, whether the legislature can constitutionally authorize the majority of a town to loan their own and the money of a minority raised by taxation and against the will of such minority, as such majority may determine.

A tax is a sum of money assessed under the authority of the State, on the person or property of an individual for the use of the State. Taxation, by the very meaning of the term, implies the

raising of money for public uses, and exclude the raising if for private objects and purposes. 'I concede,' says Black, C. J., in *Sharpless* v. *Mayor*, 21 Penn. 167, 'that a law authorizing taxation for any other than public purposes, is void.' 'A tax,' remarks Green, C. J., in *Camden* v. *Allen*, 2 Dutch. 839, 'is an impost levied by authority of government, upon its citizens or subjects for the support of the State.'

'No authority, or even *dictum*, can be found,' observes Dillon, C. J., in *Hanson* v. *Vernon*, 27 Iowa, 28, 'which asserts that there can be any legitimate taxation when the money to be raised does not go into the public treasury, or is not destined for the use of the government or some of the governmental divisions of the State.'

If there is any proposition about which there is an entire and uniform weight of judicial authority, it is that taxes are to be imposed for the use of the people of the State in the varied and manifold purposes of government, and not for private objects or the special benefit of individuals. Taxation originates from, and is imposed by and for the State.

In this case the vote of the town of Jay, and the act of the legislature passed to enable the town to carry that vote into effect, are both before us. Taking the vote of the town in connection with the article in the warrant calling the meeting, it seems that Hutchins & Lane had a 'new saw-mill and box factory at Livermore Falls,' which they were then carrying on at that place, and the town of Jay proposed to loan their credit for ten thousand dollars, and issue bonds of the town for that amount, if they would remove their saw-mill and box manufactory and put in one run of stones for grinding meal, to be located at or near Jay Bridge. The vote contemplates a mere matter of private business, the removing of certain business from one town to another, whereby the town to which the removal is made is expected to be a gainer by encouraging manufactures therein, and the town from which the removal is made is to be a loser to precisely the same extent by their removal therefrom.

Capital naturally seeks the best investment, or its owners do.

Those who by industry and economy have become capitalists are more likely to invest it well than those who, having gained none, have none to lose. The sagacity shown in the acquisition of capital, is best fitted to control its use and disposition.

It is obvious, that, if the removal from Livermore Falls would be made without special inducement, in other words, if the prospect of profit at Jay Bridge were sufficient to induce Messrs. Hutchins & Lane to move their saw-mill, etc., without any special offer of the defendant town, there would be no necessity for making such offer. It is not readily perceived that raising money under such circumstances would be of public benefit. If they should not so deem it, and it is not advantageous on the whole for them to make the removal, then it is a premium offered for them to make a removal injurious to their interest, and which they would not otherwise make, and of sufficient magnitude to induce them to meet the probable loss. Still less can it be conceived to be of 'benefit' in such case to raise money to promote losing enterprises.

It is said that it induces enterprises which would not otherwise be undertaken. But why not undertaken? Every man is the best judge of his interest. There may be exceptions, but such is the general rule. Now why is not capital invested at Jay Bridge? The answer is obvious. No one having capital to invest or loan, is willing, for any existing prospect of gain, to invest or to loan money to be thus invested. The want of existent capital or sufficient probability of profit, is the reason why the proposed undertaking has not been carried into operation.

The idea seems to be that thereby capital would be created. But such is not the case. Capital is the saving of past earnings ready for productive employment. The bonds of a town may enable the holder to obtain money by their transfer as he might do by that of any good note. But no capital is thereby created. It is only a transfer of capital from one kind of business to another.

Nor is capital created by the raising of money by taxation. If the wealth of the country were increased by taxation, the result would be, the higher the taxes the more rapid the increase of its

wealth. But the reverse is the case. The wealth of the country is lessened by the time spent in assessing and collecting taxes, and by the taxes collected, if unproductively expended.

Is the removal of the new saw-mill, etc., by Messrs. Hutchins & Lane, a public or private enterprise? Hutchins & Lane are now at Livermore. They propose to remove to Jay Bridge. It is their interest alone which they will consider. But why remove? It is no more a public purpose than any other removal of manufacture from one town to another. The town of Jay is to have no share in the anticipated profits of Messrs. Hutchins & Lane. The State is not to be a partaker of their gains. The new mill, etc. being removed, the town of Jay stands in precisely the same relation to it as other towns to new or old mills within their limits, so far as regards any public benefit to be derived therefrom. The timber of the inhabitants is sawed at the usual compensation. Their grists are ground for the same customary toll as those of others.

The industry of each man and woman engaged in productive employment is of ' benefit ' to the town in which such industry is employed. This can be predicated of all useful labor—of all productive industry. But because all useful labor, all productive industry conduces to the public benefit, does it follow that the people are to be taxed for the benefit of one man or of one special kind of manufacturing? If so, then there is no kind of labor, no manufacturing for which the minority of a town may not be assessed for the benefit of an individual. There is nothing of a public nature in the new saw-mill of Hutchins & Lane, any more entitling them to special aid than the owners of any other saw-mill. The sailor, the farmer, the mechanic, the lumberman, are equally entitled to the aid of coerced loans to enable them to carry on their business with Messrs. Hutchins & Lane. Our government is based on equality of right. The State cannot discriminate among occupations, for a discrimination in favor of one is a discrimination adverse to all others. While the State is bound to protect all, it ceases to give that just protection when it affords undue advantages, or gives special and exclusive preferences to particular individuals and par-

ticular and special industries at the cost and charge of the rest of the community.

Unless there is something peculiar and transcendental in the new saw-mill to be removed, and in the grist-mill to be erected, and in the labor of Messrs. Hutchins & Lane, it must stand in the same category with other saw-mills and grist-mills, which are and have been, and will be built, and other laborious industries, which are pursued for private gain and emolument.

The alleged justification for raising money to be loaned to private individuals for their own profit, arises from the supposed public benefit to be made of the money so loaned. But the moment the loan is effected, the bonds and money raised from their sale become the bonds and money of the person borrowing, and subject to his control. The town has lost all power over the use and disposition of their loan. True, it may sue for any violation of the contract, if any is made, in reference to the manner of using the bonds or money loaned. The loan, when once made, becomes like all loans. The other borrower has it. It is his. The loan effected, there is the end of the matter.

The question recurs, can the town raise money by taxation, merely to loan again to individuals for their own purposes; for it has been seen that the loan effected, the town loaning cannot control the use of the loan, and the loan is merely for the benefit of the individual borrowing. The bonds to be loaned, or the money to be loaned are in the hands of the loaning committee. It is to be loaned for a longer or shorter time, upon security good, bad, indifferent; fortunate, if only the latter. Is the loaning of bonds or money by the town, in any respect different from the loaning of money by individuals? Does the mere fact that the town makes the loan irrespective of any other consideration make the loan a public 'benefit' more than, or different from any other loan by an individual or banking corporation having funds to loan?

That a town cannot raise money to divide again among its inhabitants was conclusively settled, long ago, in this State, in *Hooper* v. *Emery*, 14 Maine, 379. 'To contend,' observes Shepley, J.,

'that towns have the power to assess and collect money for the purpose of distributing it again according to numbers, is to ask for a construction, not only entirely unauthorized by the language of any statute, but in direct opposition to the language of limitation employed in giving powers to towns to grant money. It not only does this, but it asks the court to give a construction to statutes, which would authorize towns, if so disposed, to violate the principles of moral justice. For if the right to assess and collect money is without limit, it would not be difficult to continue the process of collection and division until the whole property held by the citizens of the town had passed into and out of the treasury; and until an equalization of property had been effected, as nearly as it could be expected to be by placing it all in one common fund, and then dividing it by numbers, *per capita*, without distinction of sex or age. Such a construction would be destructive of the security and safety of individual industry and exertion. It would authorize a violation of what is asserted in our 'declaration of rights, to be one of the natural rights of men, that of acquiring, possessing, and protecting property. Such a construction would authorize a violation also of that clause in the constitution of this State, which provides that private property shall not be taken for public uses without just compensation, nor unless the public exigencies require it. No public exigency can require that one citizen should place his estates in the public treasury for no purpose, but to be distributed again to those who have not contributed to accumulate them, and who are not dependent on public charity.'

But whether the money raised is to be distributed *per capita* or loaned, can make no difference in principle. If towns can assess and collect money to be again loaned to such persons as the majority may select for such purposes as it may favor, with such security or without security, as it may elect, property ceases to be protected in its acquisition or enjoyment. Whether the estates of citizens are to be placed in the public treasury for the purpose of dividing them, or of loaning them to those who have not accumulated them, matters not. In either case, the owner is despoiled of his estate, and his savings are confiscated.

If the loan be made to one or more for a particular object, it is favoritism. It is a discrimination in favor of the particular individual, and a particular industry, thereby aided, and is one adverse to and against all individuals, all industries not thus aided.

If it is to be loaned to all, then it is practically a division of property under the name of a loan. It is communism incipient, if not perfected.

If it were proposed to pass an act enabling the inhabitants of the several towns by vote to loan horses or oxen, or to lease houses to any individual for his private gain, whom the majority may select, the monstrous absurdity of such legislation would be transparent. But the mode by which property would be taken from one or more and loaned to others can make no difference. It is the taking to loan, or otherwise disposing of property for private purposes, against the consent of the owner, that constitutes the wrong, no matter how taken. Whether the horse be taken from the reluctant owner to be loaned to some favored livery-stable keeper, or the loan be of money raised by the collector on its sale or by the payment of the tax to avoid such sale, does not change the result. In either case the horse or the value thereof is loaned by others, without the owner's consent. If a part of one's estate may be taken from him and loaned to others, another and another portion may be taken and loaned until all is gone.

By the constitution of this State, ' certain natural inherent and unalienable rights ' are guaranteed to the citizens of this State, ' among which are those of . . . acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.' What motive is there for the acquisition of property, if the tenure of the acquisition is the will of others ? How can our property be protected, if the legislature can enable a majority to transfer by gift or loan, to certain favored and selected individuals through the medium of direct taxation, such portions of one's estate as they may deem expedient. Men only earn when they are protected in the acquisition, possession, and enjoyment of their property. The barbarous nations of Asia have neither industry nor capital, the result

of saving, for the reason that property is without protection. Where is the protection of property if one's money or his goods can be wrested from him and loaned to others? Where is the difference between the coerced contribution of the tax-gatherer to be loaned to individuals for their benefit, and those of the conqueror from the inhabitants of the conquered territory? If one's money may be taken from him without and against his consent, to be loaned to an individual whom he would not trust, for a time which might be inconvenient, for a purpose which he might deem injudicious, what protection is afforded him? What would be thought of a statute requiring individuals to give their notes to others to be discounted for their special benefit, or to raise money to be thus loaned? What differs it whether individuals are compulsorily required to loan their notes on time to others, to be discounted for such others, or the bonds of the town are issued to be loaned, which the citizens may ultimately be compelled to pay? All security of private rights, all protection of private property is at an end, when one is compelled to raise money to loan at the will of others, or to pay his contributory share of loans of money or bonds made to others for their own use and benefit, when the power is given to a majority to lend or give away the property of an unwilling minority.

Further, by the constitution, 'private property shall not be taken for public uses without just compensation, and unless public exigencies require it.'

The right of eminent domain is an attribute of sovereignty. It is the right to seize and appropriate specific articles of property for public use when some public exigency requires it, and not otherwise.

But this is not the case of taking private property under the right of eminent domain, but of taking it under the power of taxation. But the power of taxation, as well as the right of eminent domain, has its limits, which cannot be constitutionally transcended.

In his answer to certain inquiries proposed by the legislature of this State, 58 Maine, 616, Mr. Justice Tapley uses the following clear and expressive language: 'Without entering at this time into

a discussion, or recapitulation of the reasons for the rule and the necessities which require it, I hold that the taking of private property, against the will of the owner, must find a justification in some public use and under some public exigency, and accompanied by a just compensation, and this is true whether the property be a direct seizure of it in specie and irrevocably committing it to a use, or taken by the indirect method of a loan, accompanied by some fancied or real security for a subsequent reimbursement.'

'Some distinction has been sought to be made between the right to seize specific articles of property for public use, and obtaining money through the ordinary forms of taxation, and we sometimes have a justification under the taxing power of the government. I am not able to perceive the soundness of the distinction. I understand that the right and power of taxation rests upon the right, as described by Judge Story, " of the sovereign power to appropriate not only the public property, but the private property of all citizens within the territorial sovereignty to public purposes. The difference is in the mode of taking only." '

Three elements are required to bring a case within the provision of the constitution under consideration — a public use, a public exigency, and a just compensation.

Is the removal of a new saw-mill by the owners from one town to another adjacent, to be there carried on by themselves for their own profit, for the public use? Is the building of a new grist-mill, the toll to be taken by the builders, for the public use?

Is it any more for the public use than any other industry, the benefit of which incidentally results to the public, but which is carried on for private gain? If Messrs. Hutchins & Lane were to saw for the public without compensation, or grind all grists brought to their mill without toll, the saw-mill and the grist-mill might be deemed public, precisely as a court house or State house or highway is public; but it is not pretended that such is their intention. They remove because more sawing is to be done, and more tolls are to be taken. The charges are not to be lessened. The saw-mill and the grist-mill are private property, as are all other mills

and farms owned by individuals, carried on for their own use and profit, and enacting that they are for a public use, without changing the rights of the public in the least degree, as to their right to use them cannot alter the question. It is beyond the legislative power, by force of an enactment to make that public which is essentially private.

But a public use is not all. Is there any public exigency existing requiring the removal of the new saw-mill of Hutchins & Lane from Livermore Falls to Jay Bridge to be there carried on for their benefit? Does the public exigency require the building of a new saw-mill there? If there are such public use and public exigency, then anybody's land, or mill site and land, may be taken from him by vote of the town, and leased to a lessee to be selected and voted for by the majority, and his money may be wrested from him by the tax gatherer, to pay for the mill to be erected thereon.

The remarks of Mr. Justice Woodbury, in the *West River Bridge Co.* v. *Dix*, 6 How. 545, are very pertinent and applicable to the question under consideration. 'Nor do I agree that, in all cases of public use, property which is suitable or appropriate can be condemned. . . . But the doctrine that this right of eminent domain existing for every kind of public use, or for such use when merely convenient, though not necessary, does not seem to me, by any means, clearly maintainable. It is too broad, too open to abuse. When the public use is one, general and pressing like that often in war, for sites of batteries or for provisions, little doubt would exist as to the right.

'But when we go to other public uses not so urgent, not connected with precise localities, not difficult to be provided for without this right of eminent domain, and in places where it will be only convenient, but not necessary, I entertain strong doubts of its applicability. Who ever heard of laws to condemn private property for a public use for a marine hospital or State prison?

'So a custom-house is a public use for the general government, and a court-house or jail for the State; but it would be difficult to find precedent or argument to justify taking private property, with-

out consent, to erect them on, though appropriate for the purpose. No necessity seems to exist which is sufficient to justify so strong a measure.'

But if there is no such exigency in the cases mentioned, even where the use is public, for taking private property without consent, still less can there be such exigency, where the use is private. If there is no such exigency as will justify the taking of a man's land for a jail or court-house, still less is there for· taking his mill site which he may wish to occupy, or his money which he may wish to use, to lease the one and loan the other or any portion thereof, to enable Messrs. Hutchins & Lane to place their new saw-mill, or to erect a new grist-mill thereon, or to furnish them with funds to carry on their own business.

Neither is there found the just compensation which the constitution requires. The possible, contingent and indirect benefit resulting from a manufacturing business, the prospects of which are such that the manufacturer will not invest his own, the prospects of which are such that he either will not or cannot borrow funds for the purpose, and the only mode of obtaining them is the enforced contribution from those who have no funds to loan, or having them, have no faith in the object for which the contributory assessment and collection is made, nor in the individual for whose use and profit they are collected, assuredly is not the just compensation contemplated. If the result proves fortunate, which can hardly be anticipated, the indirect benefit is no just compensation to those who have no participation in the profits. If unfortunate, it is still more difficult to perceive the 'public benefit' likely to result from an unsuccessful and disastrous speculation.

That the money may possibly be repaid is not the just compensation justifying a compulsory loan. It may never be repaid, and then where is the compensation? Besides, the true question is, whether a man is to lend his own money or others are to loan it for him, and if he is unwilling to advance to a tax-gatherer for others to loan, the legislature can constitutionally authorize the sale of his property, or commit him to jail for non-payment.

The constitution further provides that no person shall ' be deprived of his life, liberty, property, or privileges, but by the judgment of his peers or the law of the land.' Property taken by taxation is not taken by the judgment of one's peers. A statute in direct violation of the essential principles of justice, is not ' the law of the land' within the meaning of the constitution. Every citizen holds life, liberty, and property by the law and under its protection. Every enactment is not of itself and necessarily the law of the land. To declare it to be so would render this portion of the constitution nugatory and ineffectual. The phrase is adopted from Magna Charta. 'As to the words from Magna Charta,' observes Johnson, J., in *Bank of Columbia* v. *Okely*, 4 Wheaton, 235, . . . after volumes spoken and written, with a view to their exposition, the good sense of mankind has at length settled down to this, that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice.' But can any one conceive a more arbitrary exercise of the powers of government than the enforced collection of money from one man to loan the same to another?

The constitutional provision that ' private property shall not be taken for public uses without just compensation, nor unless the public exigencies require it,' by necessary implication prohibits the taking of private property for private purposes by legislative action.

If the use or the exigency for which property is taken is public, the determination of the legislature that the necessity of so taking it exists, is conclusive. *Spring* v. *Russell*, 7 Greenl. 273.

As private property can only be taken without the consent of the owner for public uses, and upon the payment of a just compensation and the existence of a public exigency requiring it to be so taken, it becomes important to consider whether the legislature are the final and conclusive judges of the existence of the public use, for which private property is authorized to be taken under the constitution. ' The provision in the constitution that no part of the. property of an individual can be taken from him or applied to pub-

lic uses without his consent or that of the legislature, and that where it is appropriated to public uses, he shall receive a just compensation therefor, necessarily implies,' observes Bigelow, C. J., in *Talbot* v. *Hudson*, 16 Gray, 421, ' that it can be taken only by such a use, and is equivalent to a declaration that it cannot be taken and appropriated to a purpose in its nature private, or for the benefit of a few individuals. In this view, it is a direct and positive limitation upon the exercise of legislative power, and an act which goes beyond this limitation must be unconstitutional and void. No one can doubt that if the legislature should, by statute, take the property of A and transfer it to B, it would transcend its constitutional power. In all cases, therefore, when this power is exercised, it necessarily involves an inquiry into the rightful authority of the legislature under the organic law. But the legislature have no power to determine finally upon the extent of their authority over private rights. This is a power in its nature essentially judicial, which they are by article 30 of the Declaration of Rights, expressly forbidden to exercise. The question whether a statute in a particular instance exceeds the just limits of the constitution must be determined by the judiciary. In no other way can the rights of the citizen be protected when they are invaded by legislative acts which go beyond the limitations imposed by the constitution. In *Tyler* v. *Beecher*, 44 Verm. 651, the principle under discussion was considered by the court, and Mr. Justice Wheeler, in delivering the opinion of the court, uses the following language : ' Wherever the use is public, the legislature has full power to determine whether a necessity for taking for such use in any class of cases exists or not. *Williams* v. *School District*, 33 Verm. 271. And the legislature has the sole prerogative of determining as to the propriety of exercising the power it has upon the necessity that does exist in any class of cases. But the legislature has not the power to so determine that a use is a public use as to make the determination conclusive. The attempt, therefore, of the legislature to exercise the right of eminent domain, does not settle that it has the right ; but the existence of the right in the legislature in any class of cases is left to be determined under the constitution by the courts.'

In delivering the opinion of the court in *Concord Railroad* v. *Greeley*, 17 N. H. 47, Gilchrist, J., in referring to a provision of the constitution of New Hampshire, similar to that of this State on this subject, uses the following language : ' The words are very comprehensive. It may include a multitude of objects. Their construction is a matter of judicial decision ; because, however decided may be the opinion of the legislature that property in a given case has been taken for a public use, still, whenever the question arises whether it has been taken, within the meaning of the constitution, it becomes our duty to determine it. The opinion of the legislature is not final upon this, more than upon any other point, when claims, cognizable in this court; depend upon the question whether or not an act of that body is or is not in conflict with the constitution. Thus, even if the legislature should declare that an act taking the property of A and giving it to B as his private property, was an application of it to public uses, no one would contend that such a declaration made that public which, in its nature and object, was private.' It is obvious, if the determination of the legislature that the purpose for which private property is taken is for a public use, and that the necessity for so taking it exists, is conclusive, that all property is held subject to its uncontrolled will. But such it seems is not regarded to be the law, but it is for the court to determine whether the use for which property is taken is or is not public.

But to constitute a public use, that will justify the taking of private property under the constitution, it is not essential that all portions of the community should derive equal benefit from the purpose for which the property is taken. It may be taken, though only portions of the community are thereby benefited.

The line of demarcation between the case when property is taken for public, and when taken for private purposes, may not always be easily determined. But in the case before us, the removal by the owners of their mill, and the business connected with it, from one town to another, cannot, under the most liberal construction, be deemed other than a private matter. It may be a loss to one town

and a gain to another, but the removal is for the private gain of the persons moving. It is in no respect other than the moving of one business man with his implements of business from one place to another.

Neither can it be deemed a public use to raise money from all the inhabitants of a town to be given, or to be loaned to one of its number, to be used by him for his individual gain.

· The very object of the provision of the statute, under and by virtue of which this bill is brought, was to prevent the misappropriation of the funds of a town when collected, or to prohibit the issuing of bonds hereafter to be paid from the moneys of the same when collected.

But even if the moving of a new saw-mill from one town to another adjacent, or the building of a new grist-mill, the moving being for the benefit of the owners of the mill, and the building of the grist-mill for the benefit of the builders, or the giving or loaning money to produce such results for such purpose, were by some strange perversion of language from its ordinary acceptation to be deemed a public use, though the public have no more right to use it than they have any other property of individuals; and if by strength of imagination a public exigency could be perceived in making such change of location and such new erection, or in giving or loaning for such purposes, and a just compensation could be found when there is or may be none whatever, and it were to be deemed a just protection of property that a majority might loan the property of a minority, or incumber it with debts for private objects against the will and protestations of such minority, still the complainants are entitled to have the injunction heretofore granted made perpetual. The legislature have not said that the removal of the new saw-mill of Messrs. Hutchins & Lane, or their building a grist-mill with one run of stones is for the ' public use,' or is required by any public exigency, but many things may be for the ' benefit' of Jay, and not for public use. Many things may be for the ' benefit' of the people of the State, which are not required by any existing ' public exigency.' All the legislature seem to have deter-

mined is that Jay affords a better site for the saw-mill and grist-mill of Messrs. Hutchins & Lane than the one occupied by them in the town of Livermore.

The constitution of the State is its paramount and binding law. The acquisition, possession, and protection of property are among the chief ends of government. To take directly or indirectly the property of individuals to loan to others for purposes of private gain and speculation against the consent of those whose money is thus loaned, would be to withdraw it from the protection of the consti-tution and submit it to the will of an irresponsible majority. It would be the robbery and spoliation of those whose estates, in whole or in part are thus confiscated. No surer or more effectual method could be devised to deter from accumulation—to diminish capital, to render property insecure, and thus to paralyze industry.

*Injunction made perpetual.*

WALTON, BARROWS, and DANFORTH, JJ., concurred.

DICKERSON, J., concurred in the result upon the principles stated in his opinion in 58 Maine, 600–606.