COMMERCIAL INS. CO. (ALSOP v.). See Case No. 262.

COMMERCIAL MUTUAL MARINE INS. CO. (UNION MUT. INS. CO. v.). See Case No. 14,372.

---

## Case No. 3,061.

### COMMERCIAL NAT BANK v. IOLA.

[2 Dill. 353;[1] 5 Chi. Leg. News, 461.]

Circuit Court, D. Kansas. June 6, 1873.[2]

CONSTITUTIONAL LAW—SPECIAL ACTS—CORPORATE POWERS—EXTENT OF TAXING POWER.

1. Article 12 of the constitution of the state of Kansas construed; and, following the interpretation of the state supreme court, *held*, that an act legalizing a special election held in a single city, and authorizing such city to issue bonds to aid a specified manufacturing enterprise, was a special act, and one which conferred corporate powers within the meaning and contrary to the prohibition of said article of the constitution.

[Followed in Citizens' Sav. Ass'n v. Topeka, • Case No. 2,734. Cited in Jarrott v. Moberly, 1d. 7,223.]

[See note at end of case.] .

2. The legislature of a state has no authority to authorize taxation in aid of private enterprises or objects; and municipal bonds issued under legislative authority, to be paid by taxation, as a bonus or donation to secure the location or aid in the erection of a manufactory or foundry owned by private individuals, are void even in the hands of holders for value.

[Followed in Citizens' Sav. Ass'n v. Topeka, Case No. 2,734. Cited in Cole v. City of La Grange, 19 Fed. 873.]

[See note at end of case.]

This is an action on coupons attached to bonds issued by the city of Iola, in Kansas, under the authority of an act of the legislature of that state. The coupons in suit and the declaration are in the usual form. The declaration avers that the bonds to which the coupons are annexed were issued in pursuance of the act of the legislature, which went into effect February 23, 1871. The nature of this act appears in the court's opinion. It is conceded that there is no general statute of the state authorizing municipalities to subscribe for the stock, or otherwise to aid such enterprises as foundries or bridge companies.

The constitution of the state of Kansas, adopted in 1859, contains the following pro-·visions: ·

---

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in Commercial Nat. Bank v. Iola City, 22 U. S. (Lawy. Ed.) 463.]

Article 2, § 17. "In all cases where a general law can be made applicable, no special law shall be enacted."

Article 12 is entitled "Corporations."

"Sec. 1. The legislature shall pass no special act conferring corporate powers. Corporations may be created under general laws; but all such laws may be amended or repealed."

"Sec. 5. Provision shall be made by general law for the organization of cities, towns, and villages, and their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, shall be so restricted as to prevent the abuse of such power."

"Sec. 6. The term 'corporation,' as used in this article, shall include all associations and joint stock companies having powers and privileges not possessed by individuals and partnerships, and all corporations may sue and be sued in their corporate name."

The declaration is demurred to on the ground that the above-mentioned act of February 23, 1871, is unconstitutional, for two reasons: 1st, because it is a special act conferring upon the city of Iola corporate powers; 2d, because it undertakes to authorize the levy and collection of taxes by the city authorities for private, as distinguished from public, purposes or objects.

Alfred Ennis, for plaintiff.

McComas & McKeighan, for defendant.

Before DILLON, Circuit Judge, and DELAHAY, District Judge.

DILLON, Circuit Judge. Without express legislative authority the city of Iola would have no power to appropriate money or to loan its credit to aid private persons to establish manufactories either near to, or within, the corporate limits. This proposition admits of no dispute, and is well settled. Stetson v. Kempton, 13 Mass. 278; Cushing v. Newburyport, 10 Metc. [Mass.] 510; Cook v. Manufacturing Co., 1 Sneed 698; Pennsylvania R. Co. v. Philadelphia, 47 Pa. St. 189; Dill. Mun. Corp. § 106. No precedent authority either by general or special act was conferred upon the city to pass the ordinance to provide for the holding of the election to determine whether the citizens would extend the proposed aid to the bridge manufactory and foundry. The adoption of the ordinance and the holding of the election were without color of law. But subsequently the legislature passed the act mentioned in the statement of the case, which undertook to legalize the election and to authorize the issue of the bonds in question. The bonds were issued under the authority of this act, and so the declaration alleges. Their binding obligation upon the municipality depends upon the validity of this enactment, and the question of its validity is raised by the demurrer to the declaration.

Against the act two objections are urged in argument: 1st, that it contravenes certain special provisions of the constitution of the state; 2d, that it authorizes the levy and collection of taxes for objects or uses not within the scope of the taxing power. The act whose constitutionality we have to determine purports to legalize the prior election in Iola and to authorize the issue of bonds pursuant to that election. If the legislature might have passed such an act prior to the election, it will not be disputed that it can ratify and confirm an election held without it, but the legislature, it is clear, cannot do by a curative or retrospective act what it could not have previously authorized. Cooley, Const. Lim. 281.

The act which was passed and which went into effect February 23, 1871, after reciting the election and legalizing it, authorizes the city to appropriate $50,000 to aid in the erection of buildings at or near the city of Iola, to be used for the purpose of manufacturing bridges, plows, and stoves, and to issue and deliver the bonds of the city, with coupons attached, payable in fifteen years, and enjoins that it shall levy and collect taxes to pay the principal and interest of the bonds. It is objected that this act violates section 1 of article 12 of the constitution of the state, which provides that the legislature shall pass no special act conferring corporate powers. That the act in question is a special act is so plain as not to justify extended discussion. It is not only limited in its application to the city of Iola, but to a single election and the issue of specific bonds. Never was an act more manifestly special.

It seems to me to be almost equally clear that it is an act which undertakes to confer upon a city corporate powers. It ratifies an election held by the city, and authorizes it to do what, without an express grant, no municipality can do, namely, to issue bonds in aid of a manufacturing enterprise, and to levy and collect taxes to pay such bonds. If the power to create a debt binding upon the municipality and to lay burdens upon all the property within it to pay the debt created, is not a corporate power, it is difficult to conceive what could justly be regarded as such.

The powers given by the terms of the act under discussion are the most important of any which can be conferred upon municipal corporations. They are, indeed, precisely the powers the exercise of which is most to be feared, and which were particularly liable to be unwisely conferred by special legislation. If this prohibition in the constitution (§ 1, art. 12) applies to municipal corporations, the special act in question plainly contravenes it. Whether the twelfth article of the constitution of Kansas, quoted in the statement of the case, was designed to apply to municipal corporations, might admit of some discussion if the question were res nova. This article is taken from the consti-

tution of Ohio.[3] And the supreme court, not only of that state, but of Kansas, has, upon full consideration, repeatedly decided that it did include municipal corporations. Atchison v. Bartholow (1866) 4 Kan. 124; Wyandotte City v. Wood (1870) 5 Kan. 603; State v. Cincinnati (1870) 20 Ohio St. 18, following Atkinson v. Marietta & C. R. Co. (1864) 15 Ohio St. 21.

In the first case cited, the supreme court of the state of Kansas held that the constitution compelled the legislature to regulate the grant of powers to municipal corporations by general laws; and hence a special act, or an act specially amending the charter of the city of Atchison in respect to making local improvements and local assessments was void. In the case next cited (Wyandotte City v. Wood) the same court adhered to this view, and accordingly held that an act of the legislature specially extending the limits of the city of Wyandotte was unconstitutional, because it contravened both sections 1 and 5 of article 12 of the constitution.

So in the case of State v. Cincinnati, above cited the supreme court of Ohio, under the same constitutional provisions, held that the legislature cannot, by special act, create a corporation; nor, by special act, confer additional powers on a corporation already existing, and that in these respects there was no difference between private and municipal corporations since the constitution equally embraced and equally applies to both classes; and therefore the act of April 16, 1870, "to prescribe the corporate limits of Cincinnati," being considered a special act, was adjudged void. See, also, Atkinson v. Marietta & C. R. Co., supra. In this case, Ranney, J., thus expounds the constitution: "These provisions of the constitution are too explicit to admit of the least doubt that they were intended to disable the general assembly from either creating corporations or conferring upon them corporate powers by special acts of legislation. It was intended to correct an existing evil, and to inaugurate the policy of placing all corporations of the same kind upon a perfect equality as to all future grants of power; of making such law applicable to all parts of the state, and thereby securing the vigilance and attention of its whole representation; and, finally, of making all judicial construction of their powers, or the restrictions imposed upon them, equally applicable to all corporations of the same class. We must give such a construction to the constitution as will preserve its leading objects intact." One of these objects in Kansas, as well as in Ohio, was to cut up by the roots the mischief of special legislation, particular-

[3] Sections 1 and 2 of article 13 of the constitution of Ohio are the same as section 1 of article 12 of the constitution of Kansas. Section 6 of article 13 of the Ohio constitution is the same as section 5 of article 12 of the Kansas constitution.

ly in respect to corporations, both public and private. The object would be defeated if the special act relating to the city of Iola could stand.

If, under the doctrine of Butz v. Muscatine, 8 Wall. [75 U. S.] 575, this court is not absolutely bound, in this class of cases, to follow the interpretation of the state constitution given by its highest court, yet it seems that it ought to follow it where it appears to rest upon solid grounds, and was made in cases and in respect to questions where there was nothing to warp the judgment of its judges, and where the interpretation was settled or had been declared at the time the act in controversy was passed.

In the latest case on this subject, decided by the supreme court of the United States, it is not denied that the supreme court of a state is the appointed expositor of its constitution and laws, and that the federal courts will adopt as rules for their own judgments the decisions of the highest courts of the state "respecting local questions peculiar to itself, or respecting the construction of its own constitution and laws." It only denies the binding force of the state adjudications which rest upon general principles of law, and not upon the meaning of special constitutional or legislative provisions. Olcott v. Supervisors [16 Wall. (83 U. S.) 678].

I think the present case is one in which it is the duty of this court to follow the decisions of the state supreme court; and so far as my judgment rests upon the special provisions of the constitution above referred to, I place it upon the state adjudications without an inquiry into their soundness.

But suppose the enactment under which the bonds in question were issued is not "a special act conferring corporate powers" within the meaning of the constitutional prohibition, the other objections made to the validity of the bonds remain to be considered. The act authorizes the creation of a debt by the municipality to raise money by the issue of bonds to be given as a donation or bonus "to aid in the erection or completion of buildings at or near the city of Iola to be used for the purpose of manufacturing Z. King's patent bridges, and as a foundry and iron works," and the act also authorizes and requires the levy and collection of such taxes as may be necessary to pay the interest and principal of these bonds. It is important to be observed that this is undeniably a private enterprise. These buildings and works are the private property of the owners. No public or municipal control over this property or the enterprise aided is specially reserved or provided for, and none exists different from that which exists as to all other property owned by private persons and devoted to private uses. The proprietors of these works are under no obligations, by reason of the aid extended and the burden of taxation thereby imposed upon the municipality, to render it or the state any duty or service

whatever—not even to repay the loan, or to maintain for any specified time the contemplated manufacturing enterprise. The state or city could not compel them to complete or operate the works or prevent their removal at pleasure to some other locality.

And thus we have presented the inquiry than which no question concerning the property-rights of the citizen is of more transcendent moment, viz: Whether the legislature may thus compel or coerce the citizen to aid in the establishment of purely private enterprises or objects because these will or may incidentally promote the general good of the community or locality. I think it safe to affirm that no such principle has yet received judicial sanction. On the contrary, the principle has been declared unsound by courts of the highest respectability.

The general subject of the extent of the taxing power in connection with municipal aid to railways has been thoroughly discussed in a majority of the states of the Union, and recently by the supreme court of the United States. Olcott v. Supervisors [supra]; Railroad Co. v. Otoe Co. [16 Wall. (83 U. S.) 667]. The courts everywhere have agreed that taxes can lawfully be imposed for public purposes only; and therefore, in the language of Chief Justice Black: "The legislature has no constitutional right to create a public debt or authorize any municipal corporation to do it in order to raise funds for a mere private purpose. No such authority passed to the assembly by the general grant of legislative power. This would not be legislation. Taxation is a mode of raising revenue for public purposes. When it is prostituted to objects in no way connected with the public interests or welfare, it ceases to be taxation and becomes plunder. Transferring money from the owners of it into the possession of those who have no title to it, though it be done under the name and form of a tax, is unconstitutional, for all the reasons which forbid the legislature to usurp any other power not granted to them. * * * An act of the legislature authorizing contributions to be levied for a mere private purpose, or for a purpose which, though it be public, is one in which the people from whom they are exacted have no interest, would not be a law, but a sentence commanding the periodical payment of a certain sum by one portion or class of people to another. The power to make such order is not legislative, but judicial, and was not given to the assembly by the general grant of legislative authority." Sharpless v. Philadelphia, 21 Pa. St. 147. Similar language is held by Mr. Justice Strong, in delivering the opinion of the supreme court of the United States in the recent case of Olcott v. Supervisors [supra]. The learned justice says "that the taxing power of the state extends no further than to raise money for a public use, as distinguished from private, or to accomplish some end public in its nature."

Again he says: "No one contends that the power of a state to tax, or to authorize taxation, is not limited to the uses to which the proceeds may be devoted. Undoubtedly taxes may not be laid to a private use." See Freeland v. Hastings, 10 Allen, 570; Tyson v. School Directors, 51 Pa. St. 9.

The only question, therefore, is, whether the use for which taxation in the present case is authorized is a public or a private use. The supreme court of the United States, in sustaining the validity of legislative acts authorizing municipal aid to railways, place it upon the distinct ground that highways, turnpikes, canals, and railways, although owned by individuals under public grants or by private corporations, are publici juris; that they have always been regarded as governmental affairs, and their establishment and maintenance recognized as among the most important duties of the state, in order to facilitate transportation and easy communication among its different parts. Rogers v. Burlington, 3 Wall. [70 U. S.] 654; Mitchell v. Burlington, 4 Wall. [71 U. S.] 270; Railroad Co. v. Otoe Co., supra. Therefore it is that in favor of such improvements the state may put forth its right of eminent domain, and also as now established by judicial decisions, unless the right be denied it in the constitution, its power to tax. That these acts may lawfully be done is because, and only because, the use is a public one, public in its nature; and hence these works are subject to public control and regulation, notwithstanding they may be constructed under legislative authority and be exclusively owned by private persons or corporations. Compulsory taxation in favor of railways and like public improvements owned by individuals or companies, is an exercise of power going quite to the verge of legislative authority. Although it is a doctrine that must now be considered as judicially settled, still it is one which has encountered a vigorous opposition, both on the ground of expediency and of power, and the exercise of the authority has been so disastrous, as already in some of the states to have led to constitutional provisions for the protection of the citizen.

But it is obvious from the statement of the grounds upon which such legislation rests, that it furnishes no support for the validity of taxation in favor of enterprises and objects essentially private; and such I consider to be the establishment of a bridge manufactory or foundry owned by private individuals. Cases may be imagined giving rise to doubts whether the use be public or private, but the one in hand does not seem to be difficult to class. It is certainly not usual for the legislature to undertake to exercise the right of eminent domain to procure sites for hotels, banks, manufactories, stores, and the like, and it may be safely said, unless extraordinary circumstances may occasionally furnish an exception, that private property cannot lawfully be condemned for such purposes; and the reason is that it would not be a taking for public use, nor justified by any reasonable necessity.

So taxation to aid ordinary manufactories, or the establishment of private enterprises, is a device, until recently, quite unheard of; and the power must be denied to exist unless all limits to the appropriation of private property and to the power to tax be disregarded. The question under discussion must be determined upon some principle, and I hold it to be sound doctrine that the mere incidental benefits to the public or the state which result from the pursuit by individuals of ordinary branches of business or industry do not constitute a public use in a sense which justifies the exercise of either the power of eminent domain or of taxation. If this salutary principle be abandoned, we unsettle the foundations of private property, and unwisely open the door for frauds and abuses of the most alarming character.

That these views are sound I entertain no doubt, but my conviction of their soundness has been much strengthened by the decision of the supreme judicial court of Massachusetts, declaring unconstitutional the act authorizing the issue of what is known as the "Summer Street Fire Bonds." In November, 1872, a considerable portion of the city of Boston was destroyed by fire. In December following the legislature empowered the city to issue bonds to the amount of twenty-five millions of dollars, the proceeds of which three commissioners, appointed by the mayor, were authorized to loan in a safe and judicious manner "in such sums as they shall determine, to the owners of land, the buildings upon which were burned by the fire in said Boston, on the ninth and tenth days of November, 1872, upon the notes or bonds of said owners secured by first mortgages of said land; said mortgages to be conditioned that the rebuilding shall be commenced within one year from the first day of January, 1873; and said commissioners to have full power to apply the proceeds of said bonds in making said loans in such manner, and to make such further provisions, conditions, and limitations in reference to said loans, and securing the same, as shall be best calculated. in their judgment, to insure the employment of the same in rebuilding upon said land burned over, and the payment thereof to the said city."

In the late case of Lowell v. Boston [111 Mass. 454], the constitutionality of this act was the question to be decided. It will be seen that the object of the act, as shown by its provisions, was "to insure the speedy rebuilding on land the buildings upon which were burned" by the great fire; and the question was as to the right of the state to impose any taxes for this object, and this depended upon the further question whether this object was, in a legal sense, a public object.

The court distinctly held, to use the lan-

guage of the rescript sent down in the case, that taxes can only be laid "for some public service or some object which concerns the public welfare;" that "the preservation of the interests of individuals either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private and not a public object." "That the incidental advantages to the public or to the state which result from the promotion of private interests, or the prosperity of private enterprises or business, do not justify their aid by taxation." "That as a judicial question the case is not changed by the magnitude of the calamity which has created the emergency." And, finally, the court say: "The expenditure authorized by this statute being for private and not for public objects, in a legal sense, it exceeds the constitutional power of the legislature, and the city cannot legally issue the bonds for the purposes named in the act." See, also, as to distinction between public and private use: Bloodgood v. Mohawk & H. R. Co., 18 Wend. 65; [Allen v. Jay, 60 Me. 124].[4] Jenkins v. Andover, 103 Mass. 94, holding invalid a statute authorizing taxation in favor of a private incorporated academy. Same principle, Curtis v. Whipple, 24 Wis. 350; People v. Salem, 20 Mich. 452.

As the only authority for the issue of the bonds in question was an unconstitutional act of the legislature, they are void—void from the beginning, and void into whosesoever hands they may come. All persons must, at their peril, take notice of the power of municipal corporations or officers to issue securities, and especially is this so where the want of power results from constitutional prohibitions or provisions. The Floyd Acceptances, 7 Wall. [74 U. S.] 676; Marsh v. Fulton Co., 10 Wall. [77 U. S.] 676; Clark v. Des Moines, 19 Iowa, 199; Steines v. Franklin Co., 48 Mo. 167.

The demurrer to the declaration is sustained, and unless the plaintiff desires to amend, judgment will be entered for the defendant. Judgment for defendant.

NOTE [from original report]. In Allen v. Jay [60 Me. 124], the supreme court of Maine recently decided (July term, 1871) a similar question. The opinion of the court was delivered by Appleton. C. J. In that case the legislature had authorized the town of Jay to lend $10,000 to certain men to enable them to build a saw mill and grist mill, and to exempt the mills from taxation for ten years. and the act was adjudged invalid: Dill. Mun. Corp. (2d Ed.) § 105a. The following is the rescript sent down by the supreme judicial court of Massachusetts in the case of Lowell v. Boston, supra:

"The issue of bonds by the city, whatever provision may be made for their redemption, involves the possible and not improbable consequence of a necessity to provide for their payment by the city. The right to incur the obligation implies the right to raise money by taxation for the payment of the bonds. The point of difficulty in the case is not as to the distribution of the burdens by allowing it to be imposed upon a limited district within the state, but as to the right to impose any tax for the object contemplated by the statute. The power to levy taxes is founded upon the right, duty, and responsibility to maintain and administer the governmental functions of the state, and to provide for the public welfare. To justify any exercise of the power requires that the expenditures which it is intended to meet, shall be for some public service or some object which concerns the public welfare. The preservation of the interests of individuals either in respect of property or business, although it may result incidentally in the advancement of the public welfare, is, in its essential character, a private, and not a public object. However certain and great the resulting good to the general public. it does not, by reason of its comparative importance, cease to be incidental. The incidental advantages to the public or to the state which result from the promotion of private interests, and the prosperity of private enterprises or business, do not justify their aid by the use of public money raised by taxes alone, or for which taxation may become necessary. It is the essential character of the direct object of the expenditure which must determine its validity, as justifying a tax; and not the magnitude of the private interests to be effected, or the degree to which the general interests of the community, and thus the public welfare, may be ultimately benefited by the promotion of those private interests. By the terms of the statute, the proceeds of the bonds thereby authorized are to be expended in loans to persons who are or may become owners of land in Boston, 'the buildings upon which were burned by the fire in said Boston on the ninth and tenth days of November, 1872.' The ultimate end and object of the expenditure, as indicated by the provisions of the statute itself, is to 'insure the speedy rebuilding on said land.' The property thus created will remain exclusively private property, to be devoted to private uses, at the discretion of the owners of the land, with no restrictions as to the character of the buildings to be erected or the uses to which they shall be devoted, and with no obligation to render any service or duty to the commonwealth or the city—except to repay the loan—or to the community at large, or to any part of it. If it be assumed that the private interests of the owners will lead them to re-establish houses, shops, and manufactories, and that the trade and business of the place will be revived or enlarged by means of the facilities thus afforded, still these are considerations of private interest, and if expressly declared to be the aim and purpose of the statute, they would not constitute a public object in any legal sense.

"As a judicial question, the case is not changed by the magnitude of the calamity which has created the emergency, nor by the greatness of the emergency or the extent and importance of the interests to be promoted. These are considerations affecting the propriety and expediency of the expenditure, as a legislative question only. If an expenditure is, in its nature, such as will justify taxation under any state of circumstances, it belongs to the legislature exclusively to determine whether it shall be authorized in the particular case; and however slight the emergency or limited and unimportant the interests to be promoted, the court has no authority to rev se the legislative action. On the other hand, if its nature is such as not to justify taxation in all cases in which the legislature might see fit to give authority therefor. no stress of circumstances affecting the expediency, importance, or general desirableness of the measure, and no concurrence of legislative and municipal action, or preponderance of popular favor, in any particular, will satisfy the element necessary to bring it within the scope of legislative power. The expenditure authorized by this statute being for pri-

vate and not for public objects, in a legal sense, it exceeds the constitutional power of the legislature; and the city cannot legally issue the bonds for the purposes named in the act."

[NOTE. Plaintiff sued out a writ of error, and the supreme court affirmed the judgment below.

[This case differed only from the case of Citizens' Sav. & Loan Ass'n v. Topeka, 20 Wall. (87 U. S.) 655, decided at the same time, in that in this case the bonds were issued before the general act of February 29, 1872, at a time when there was no statute professing to authorize such a proceeding, and that, after the vote in favor of the issue, the legislature undertook to legalize the election, and to authorize the city officials to deliver the bonds and levy the taxes necessary to pay the principal and interest.

[After stating the foregoing difference in the facts as to the two cases, the court (Mr. Justice Miller delivering the opinion) affirmed the judgment of the circuit court on the authority of Citizens' Sav. & Loan Ass'n v. Topeka, supra. Commercial Nat. Bank v. Iola City, 22 U. S. (Lawy. Ed.) 463. See, also, Citizens' Sav. Ass'n v. Topeka, Case No. 2,734.]