143  287
†145  370

143  287
154  691

143  287
f156 526

143  287
160  214
160  215
160  216
160  218

143  287
162   70

THE STATE *ex rel.* GARTH *et al., Executors of Conley's Will*, v. SWITZLER, *Judge of Probate.*

In Banc, March 15, 1898.

1. **Certiorari**: TAXATION PROCEEDINGS OF INFERIOR COURTS. The Supreme Court has power by *certiorari* to supervise the proceedings of probate courts; and, if, in levying taxes under the collateral succession laws, they exceed their authority, will quash their proceedings.

2. **Taxation**: FOR A PUBLIC PURPOSE. Because of the inhibition of the Missouri Constitution, that "taxes may be levied and collected for *public purposes only*," it is *held* that the General Assembly can not levy a tax for a private purpose or for the benefit of any private person. And it is further *held* that the word "taxes" as there used is to be understood in its generic sense, as expounded by lexicographers, judges and lawyers long before the present Constitution was established; and being used in its generic sense, the words "taxes may be levied for public purposes only" must be understood to include every character and kind of tax, general and special.

3. ———: SUCCESSION OR DEVOLUTION TAX. The General Assembly has authority to levy a succession or devolution tax under the Missouri inheritance laws and statute of wills, so long as such tax is for a "public purpose only," and does not otherwise conflict with the Constitution, and is levied uniformly on the amounts actually received by the individual legatees or distributees.

4. ———: ACTS OF LEGISLATURE: PRESUMABLY CONSTITUTIONAL. The presumption is that the legislature will levy a tax only for a public purpose, and the courts are justified in prohibiting the collection of the tax only when it clearly appears that the Constitution has been or will be violated by the enforcement of a legislative enactment.

5. ———: PUBLIC PURPOSE: INDIRECT BENEFITS. Indirect benefits to a community generally, caused by the disposal of public money upon private persons to aid them in building up industrial enterprises, do not furnish a basis for taxing the members of the community under the disguise that such money is used for a "public purpose."

State ex rel. v. Switzler.

6. ———: SUCCESSION TAX: PUBLIC PURPOSE: STATE UNIVERSITY: STUDENTS: GIFT. A collateral inheritance tax of five per cent on all property devised or descending to nephews and nieces or other collateral kindred, if levied for the support of the State university, is held to be a tax for a public purpose; but if the tax is to raise a fund the proceeds of which are to be paid to certain favored individuals to enable them to buy food and clothing for their own use while students in the university, the tax is not for a public purpose, and is unconstitutional. Under this view, the act of April 1, 1895, entitled "An Act providing for the endowment of the State University, and for the establishment and endowment of free scholarships of merit therein in each county," which directs three fourths of the proceeds of the fund derived from a tax on collateral inheritances to be paid to students "while attending the university *for defraying the expenses of such attendance*," is *held* to be unconstitutional, as levying a tax for private purposes. It is also *held* that so long as the increment of the fund is to be used for private purposes, the fund itself can not be considered as having been created for public purposes. *Held*, also, that said act endows the student, not the university; that it provides in unmistakable terms that a fund shall be raised by taxation and paid over to students for their support while attending the university, and is therefore a gift of public money to private individuals.

7. ———: PATERNALISM. Under our theory of government the citizen is the unit. It is his province to support the government, and not the government's to support him. Paternalism minimizes the citizen and maximizes the government. It means excessive government, a quasi-fatherly relation of the government to the citizen and his family, on the theory that the people are incapable of managing their own affairs. It is pernicious in its tendencies, and taxation can not be justified in its name.

8. ———: CONSTITUTION: FAVORED CLASSES: GENERAL INHIBITIONS. The Constitution of Missouri sedulously curbs the power of the General Assembly to legislate in behalf of favored classes, and especially has it jealously hedged about and limited the power of taxation.

9. ———: ———: ———: TO SUPPORT UNIVERSITY STUDENTS. The Constitution no more gives the legislature authority to raise money by taxation to be handed over to young men and young women to be used by them in supporting themselves while acquiring "the higher or university education," than it authorizes it to levy taxes to be used in clothing and feeding the children who may attend the free public schools. It contains no warrant for either.

10. ———: SUCCESSION TAX: DEFINITION. A succession tax is an excise or duty upon the right of a person or corporation to receive property by devise or inheritance from another under the regulation of the State. It is a burden on each person claiming succession, measured

by the value of his interests and collectible out of his interest only. Until the vesting of the estate the power to tax does not exist.  In the absence of a transfer and a transferee, there is no basis for a succession tax.

11. ———: ———: EFFECT OF.  The mere calling of a tax in a 'statute "a succession tax" does not make it such.  It may in fact be a property tax; and if its effect and operation are identical with a property tax, it will be held to be such.  A tax, levied upon the appraised value of the whole estate left by decedent, to be paid, not by his legatees or heirs, but by his personal representative, whether that estate is solvent or *insolvent*, is held to be a property tax, and being a property tax it is unconstitutional, because it subjects such estate to a property tax additional to that levied upon all other like property in the State for the same year, and is not levied in proportion to its value.

12. ———: SUCCESSION TAX: UNIFORMITY.  A statute that imposes a tax of five per cent on the whole estate of decedent, and seven and a half per cent additional on all of said estate in excess of ten thousand dollars, is in violation of the constitutional requirement that taxes "shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax."

*Certiorari.*

PROCEEDINGS QUASHED.

*Turner & Hinton, C. B. Sebastian* and *W. M. Williams* for relators.

(1)  John C. Conley died prior to the passage of the amendatory acts of March 16 and 17, 1897. If, therefore, the act of April 1, 1895, is in conflict with the Constitution, there was no law in force at the time of his death imposing a collateral succession tax.   Const. art. II., sec. 15; *In re Langdon*, 41 N. E. Rep. 401; *In re Embury*, 45 N. Y. S. 621; *Estate of Roosevelt*, 25 L. R. A. 695.   (2)   The act of April 1, 1895, is in conflict with section 28 of article IV of the Constitution of this State.    *Witzman v. Railroad*, 131 Mo. 612; *State ex rel. v. Baker*, 129 Mo. 482; *State ex rel. v. Heege*, 135 Mo. 112; *Henderson v. Ins. Co.*, 34 N. E. Rep. 565; *Moses v. The Mayor*, 51 Ala. 198.   (*a*)   The act con-

tains more than one subject, and for that reason is a violation of the constitutional provision. (*b*) The title is insufficient and misleading. (*c*) The legislature seems to have recogonized the insufficiency and misleading character of the title of the original act and changed it in the act of 1897 so as to show some of the various kinds of taxes created. This is a clear indication that the legislative department of the State deemed the title of the act of 1895 too narrow to give such fair notice of its contents, to those interested, as should be given. (3) (*a*) The text provided for by this act is not levied for a public purpose, within the meaning of section 3, of article X, of the Constitution. *Deal v. Mississippi Co.*, 107 Mo. 464; *Loan Ass'n v. Topeka*, 20 Wall. 655; *Cole v. LaGrange*, 113 U. S. 1; *Lowell v. Boston*, 111 Mass. 463; *State ex rel. v. Osawkee Township*, 14 Kan. 418; *Kingman v. Brocton*, 11 L. R. A. 123; *Allen v. Inhabitants, Etc.*, 60 Me. 124; *Feldman v. Charleston*, 23 S. C. 57; *Mead v. Acton*, 1 N. E. Rep. 413. (*b*) The General Assembly has no power to make a grant of public money or thing of value to any individual, or asssociation of individuals, nor to authorize any county of the State so to do. Sections 46 and 47, article IV of the Constitution. It is not denied that the support of the State university is a public purpose for which a tax may be legitimately levied. But it is quite another thing to furnish money from such sources to students, to enable them to buy food and clothing for their own use while pursuing their studies. (*c*) This money is not even required to be used for the support and maintenance of the holder of the scholarship. It is paid for that purpose, but when given to him, it becomes his property, and no account is demanded of its disposition. (*d*) The bounty created by the act is to be paid to a favored class, who are in nowise a public charge, and are not treated as

such.   It is, in effect, the exaction of money from one class of persons for the benefit of another class.   Cooley on Tax. [2 Ed.], p. 221; Burroughs on Taxation, pp. 18–21; *Sewickley School Dist. v. Osborne School Dist.*, 6 Pa. Dist. Rep. 211; *Philadelphia Ass'n v. Wood*, 39 Pa. St. 73; *State v. Osawkee Township*, 14 Kan. 418; *Mead v. Acton*, 1 N. E. Rep. 413; *Henderson v. Insurance Co.*, 34 N. E. Rep. 565; *Hitchcock v. St. Louis*, 49 Mo. 484.   (e)  The purpose of this tax being to raise a bounty for a privileged class of students at the university, it can not be said that one part of the act may be valid although another part is in violation of the Constitution.   The various provisions of the act are wholly inseparable, so far as the general object is concerned. The case comes within the principle laid down in *Webb v. Lafayette Co.*, 67 Mo. 363; *Chambe v. Durfee*, 58 N. W. Rep. 661; Cooley on Const. Lim., sec. 178.  (4) The tax created by the first section of the act of April 1, 1895, is not "uniform upon the same class of subjects within the territorial limits of the authority levying the tax." It charges a higher rate when the amount of the property exceeds $10,000, than when its value is less than that sum, and is in violation of section 3, article X, of the Constitution of this State; and also, of the fourteenth amendment of the Constitution of the United States, and, if regarded as a tax upon the property of the estate, as the language used would indicate, it is not levied in proportion to value, and can not be upheld under section 4, article X, of the Constitution. *State ex rel. v. Ferris*, 30 L. R. A. 218; *State ex rel. v. Gorman*, 41 N. W. Rep. 948; *Curry v. Spencer*, 60 Am. Rep. 337; *State ex rel. v. Mann*, 45 N. W. Rep. 526; *State v. Hamlin*, 25 L. R. A. 632; *State v. Speigle*, 75 Mo. 145; *State v. Julow*, 129 Mo. 163.  (a)  The language of the act requires the tax to be levied upon the appraised value of the estate left by the deceased, and

it becomes a charge upon said estate, which the personal representative is to pay out of the assets in his hands. It is perfectly apparent, therefore, that in the manner in which this tax was levied, its operation and effect upon the estate is precisely the same as if it was a tax upon the property itself. *In re Westburn Estate*, 46 N. E. Rep. 315. Regarded as a tax on property, it is too plain for argument that it violates the constitutional provision requiring taxes upon property to be levied in proportion to value. (*b*) If, upon the other hand it can be construed as establishing a succession tax, then the constitutional mandate that taxes must be "uniform upon the same class of subjects," is applicable. It is a mere arbitrary division to set off classes of successions, according to valuation, and impose a different rate per cent, as the value of the property is greater or less. If this can be done, there is no limit to the number of classes into which successions by those standing in the same relation to the deceased, may be divided for taxation. *County v. Railroad*, 13 Fed. Rep. 722. (5) A succession tax should be paid by the legatee or distributee, or be taken out of his particular share. *State ex rel. v. Mann*, 45 N. W. Rep. 526; *Moore v. Sargent*, 104 U. S. 689. (*a*) The act of March 16, 1897, requires the estate to be valued and the tax assessed immediately after the return of the inventory and appraisement. It is impossible at that time to determine what debts will be established against the estate, or whether there will be anything for legatee or distributee. The tax must be paid, too, before the expiration of the time for proving debts. *In re Westburn Estate*, 46 N. E. Rep. 315. (*b*) The act makes no provision for notice to the parties interested, and gives them no opportunity to be heard upon the assessment. Such notice, as well as an opportunity to be heard, is a constitutional right. (*c*) If the act, as it

came from the legislature, is unconstitutional, because it fails to provide for notice and a hearing it can not subsequently be validated by the appearance of the parties interested before the probate judge. *Stuart v. Palmer*, 74 N. Y. 183; Dos Passos on Inher. Tax Laws [2 Ed.], sec., 22; *Evans v. Fall River Co.*, 68 N. W. Rep. 195; *Bieswarger v. Warner*, 5 Mo. App. 582. (6) Where an act, or portion of an act, is amended "so as to read" in a prescribed way, it has been said that the section amended is entirely repealed and obliterated thereby. Endlich on Interp. of Stat., sec. 196, p. 265; *State ex rel. v. Railroad*, 9 Mo. App. 532; *Knox v. Baldwin*, 80 N. Y. 610; *Nash v. Bank*, 45 N. Y. 243.

*Silas B. Jones* also for relators.

(1) The legislature may lawfully interfere with private property only in the following instances: (*a*) It may authorize it to be forfeited for crime, or sold for the owner's debts, in pursuance of judicial proceedings. (*b*) It may take it under the power of eminent domain for public use. (*c*) It may condemn it under the police power, when its use or situation is such as to endanger public safety. (*d*) It may take it by virtue of the taxing power. Except on these grounds, private property is inviolable, is beyond the reach of the legislature. *Hanson v. Vernon*, 27 Iowa, 28. (2) The succession tax, whether it be regarded as imposed upon the property or upon the succession or devolution of property by will or intestacy, is in either case a special tax. *In re McPherson*, 104 N. Y. 306; *Curry v. Spencer*, 61 N. H. 624. (3) The succession tax is a tax on the right of succession under a will, or by devolution in case of intestacy. *In re Hoffman*, 143 N. Y. 327; *In re Est. of Swift*, 137 N. Y. 77; *State v. Dalrymple*, 70 Md. 294;

*Schoolfield v. Lynchburg*, 78 Va. 370; Dos Passos Inher. Tax Law [2 Ed.], sec. 8, p. 31. It is not a tax upon property, but upon the right to receive property. *State v. Ferris,* 41 N. E. Rep. 579; *State v. Alston*, 30 S. W. Rep. 750; *U. S. v. Perkins*, 163 U. S. 625; *State v. Hamlin*, 83 Me. 495; *Minot v. Winthrop*, 162 Mass. 113; Cooley on Taxation [2 Ed.], p. 584. (4) Every burden imposed by the State with a view to revenue is done by virtue of the taxing power, whether imposed under the name of a tax or some other designation. *Glasgow v. Rowse*, 43 Mo. 490; *St. Louis v. I. & T. Co.*, 47 Mo. 150; *St. Louis v. Spiegel*, 90 Mo. 587; *St. Louis v. Bowler*, 94 Mo. 630; *St. Louis v. Green*, 70 Mo. 562; *St. Joseph v. Ernst*, 95 Mo. 360. (5) Taxes may be levied and collected for public purposes only. Constitution, art. X, sec. 3; *Deal v. Mississippi Co.*, 107 Mo. 464; *Egyptian Leevee Co. v. Hardin*, 27 Mo. 498; *Glasgow v. Rowse*, 43 Mo. 479; *Railroad v. Maguire*, 49 Mo. 490; *Sheehan v. Hospital*, 50 Mo. 155. (6) A law which specifically appropriates the property of the citizen and takes it from one person and transfers it to another, would not be an exercise of the taxing power, no matter by what name it is called. *Railroad v. Maguire*, 49 Mo. 490; *State ex rel. v. Leffingwell*, 54 Mo. 475; *Deal v. Mississippi Co.*, 107 Mo. 464. (7) The legislative branch of the government is without lawful power to take private property for private purposes, to take the property of A. and give it to B.; an enactment of the legislature, in the form of a law, having such an object in view would not be in any proper sense a law, but a rescript, a decree of confiscation; and the stripping of the citizen of his property thereunder would be an act of plunder or robbery; and against such usurpation of power by the legislature it is the duty of the judicial branch of the government to protect the citizen. *Deal v. Mississ–*

*ippi Co.*, 107 Mo. 464; Cooley on Tax. [2 Ed.], pp. 1, 8, 103, 115; Cooley Const. Lim. [6 Ed.], pp. 207, 587, 598; Black Const. Law, sec. 118, p. 336; Black, Tax, Titles [2 Ed.], sec. 20; 2 Dillon, Corp. [4 Ed.], sec. 736; 1 Hare's Am. Const. Law, p. 277; *Loan Ass'n v. Topeka*, 20 Wall. 655; *Parksburg v. Brown*, 106 U. S. 487; *Cole v. LaGrange*, 113 U. S. 1. (8) Taxes can not be levied to aid a private manufacturing establishment, or to assist any citizen in his private business enterprise, no matter how great the indirect, incidental or consequential benefit therefrom may be to the public; for such is not a public purpose. *Deal v. Mississippi Co.*, 107 Mo. 464; *Loan Ass'n v. Topeka*, 20 Wall. 655; *Allen v. Jay*, 60 Me. 124; *Cole v. LaGrange*, 113 U. S. 1; *Mather v. Ottawa*, 114 Ill. 659; *Weismer v. Douglass*, 64 N. Y. 91; *State v. Osawkee Tp.*, 14 Kan. 418; *Bank v. Iola*, 2 Dill. C. C. 353; *Cole v. LaGrange*, 19 Fed. Rep. 871; Cooley Taxation, p. 126. (9) The direct object for which a tax is levied is to to be alone considered in determining whether the purpose is public or private. Incidental or consequential benefits to the public are not sufficient to make the purpose public. If the direct object is private, no amount of incidental or consequential benefit to the public can sustain the tax. *Lowell v. Boston*, 111 Mass. 454; *Feldman v. City Council*, 23 S. C. 62; *Bank v. Iola*, 2 Dillon, C. C. 353; *Loan Ass'n v. Topeka*, 20 Wall. 655; *Curtis v. Whipple*, 24 Wis. 350; *Whiting v. Railroad*, 25 Wis. 189; *People v. Salem*, 20 Mich. 452; *State v. Wade*, 35 Atl. Rep. 4; *Deal v. Mississippi Co.*, 107 Mo. 464.

*M. F. Watts* also for relators.

(1) The act is unconstitutional because in contravention of section 28 of article IV of the Constitu-

tion, in that: (*a*) The title contains two separate and distinct subjects, not congruous, cognate or logically connected; (*b*) the subject-matters of the act are not expressed in the title, and are not germane, congruous or logically connected with either subject expressed in the title. *State v. Burgdoerfer*, 107 Mo. 1; *State ex rel. v. Laughlin*, 75 Mo. 358; *Wolfe v. Bronson*, 115 Mo. 271; *Hixon v. Lafayette Co.*, 41 Mo. 40; *St. Louis v. Tiefel*, 42 Mo. 578; *State v. Matthews*, 44 Mo. 523; *State v. Miller*, 45 Mo. 495; *State v. Bank*, 45 Mo. 528; *In re: Burris*, 66 Mo. 442; *Hannibal v. Marion Co.*, 69 Mo. 571; *State ex rel. v. Mead*, 71 Mo. 266; *Kansas City v. Payne*, 71 Mo. 159; *State ex rel. v. Ranson*, 73 Mo. 78; *Ewing v. Hoblitzelle*, 85 Mo. 64; *Attorney-General v. Miller*, 100 Mo. 441; *Park District v. County Court*, 102 Mo. 531; *State ex rel. v. County Court*, 128 Mo. 427; *St. Louis v. Weitzel*, 130 Mo. 600; *State ex rel v. Heege*, 135 Mo. 112. (2) The act is void and inoperative in so far as it affects property devised by will, because of its indefiniteness, vagueness, ambiguity and uncertainties. *Hughes'* case, 1 Bland (Md.) 466; *State v. Partlow*, 91 N. C. 550; *Drake v. Drake*, 4 Dev. 110; *Chaffe's Appeal*, 56 Mich. 244; *Ward v. Ward*, 37 Tex. 389; *McConnell v. Jersey City*, 39 N. J. L. 38; *Fairchild v. Masonic Hall Ass'n*, 71 Mo. 527; Endlich on Interp. of Stat., sec. 22.

*L. F. Parker* also for relators.

(1) The act violates section 28 of article IV of the Constitution of Missouri in that the subject of the act is not "clearly expressed in its title." Cooley, Const. Lim., p. 172; *In re Borough Phoenixville*, 109 Pa. St. 44; *St. Louis v. Tiefel*, 42 Mo. 578; *State v. Miller*, 45 Mo. 496; *Hannibal v. Marion Co.*, 69 Mo. 571; *State v. Ranson*, 73 Mo. 78; *Ewing v. Hoblitzelle*,

85 Mo. 64; *Mayor v. City*, 99 N. Y. 569; *State ex rel. v. Miller*, 100 Mo. 439; *State ex rel. v. Lafayette Co.*, 41 Mo. 39; *State ex rel. v. County Court*, 102 Mo. 531.

*Frank M. Estes amicus curiae.*

.I appear in this matter specially representing the estate of Joseph B. McCullagh, the largest estate now in course of administration in the St. Louis probate court affected by said enactments, and the points involved in that estate are identical with those in the Spear estate, and I most respectfully ask that I be heard. (1) Said enactments are invalid because in contravention of article II, section 30, of the Constitution of Missouri; and amendments 5 and 14 of the Federal Constitution. Cooley on Tax. [2 Ed.] 363, 364; *Stuart v. Palmer*, 74 N. Y. 191; Cooley's Const. Lim. 355; *Campbell v. Dwiggins*, 83 Ind. 473; *Potosi v. Carey*, 27 Mo. 372; *State v. Spencer*, 114 Mo. 574; *In re McPherson*, 104 N. Y. 306; *Wallace v. Meyers*, 38 Fed. Rep. 184; *State v. Hamlin*, 86 Me. 495. (2) Such enactments are in contravention of article II, section 20, of the Constitution of Missouri, prohibiting the taking of private property for private use. Cooley's Const. Lim. [6 Ed.] 435; *St. Louis v. Hill*, 116 Mo. 527; *River Rendering Co. v. Behr*, 77 Mo 91; *In re McPherson*, 104 N. Y. 318. (3) Such enactments are invalid because in contravention of article XI, sections 5 and 6, of the Constitution of Missouri, prescribing the particular source from which the State university may be aided and maintained. *State ex rel. v. Fisher*, 119 Mo. 344; Supreme Court Opinion, 14 R. I. 651; *Page v. Allen*, 58 Pa. St. 336; *Field v. People*, 3 Ill. (2 Scam.) 79; Cooley on Const. Lim. [6 Ed.] 78; *Smith v. Stevens*, 10 Wall. 324; *State v. Hallock*, 14 Nev. 202.

*William J. Stone, G. S. Hoss* and *D. C. Reeves* for respondents.

(1)    The remedial features of the acts of March 16 and 17, 1897, are applicable to the act of April 1, 1895.    And it is contended by respondent that the jurisdiction conferred by the act of 1897 on the probate courts to fix the valuation of estates, directing the payment of the taxes, etc., applies to estates in process of administration prior to the passage of those acts, and subject to the tax imposed by the act of 1895.    *State v. Kerr*, 8 Mo. App. 125; *State v. Railroad*, 9 Mo. App. 532; *Railroad v. Cudmore*, 103 Mo. 634; *Van Rheeden v. Bush*, 44 Mo. App. 283; *Lovell v. Davis*, 52 Mo. App. 342; *Kick v. Doerste*, 45 Mo. App. 134; *State v. Police Com.*, 34 Mo. 546; *Wellshear v. Kelly*, 69 Mo. 354; *Porter v. Mariner*, 50 Mo. 367; *State v. Johnson*, 81 Mo. 60; *Cramer v. Hager*, 91 Mo. 456.    (2) If a State legislature shall pass a law within the general scope of its constitutional powers, the courts can not pronounce it void because in their judgment it may be unwise as a matter of public policy or contrary to the principles of natural justice.    *Calder v. Bull*, 3 Dalls. 386; *Satterlee v. Mathewson*, 2 Pet. 380; *Morris v. Clymer*, 2 Barb. 285.    (3) The tax levied by section 1 of the act of April 1, 1895, is not a tax on property, but is a tax, excise or bonus imposed on the privilege of succeeding to property of decedents by gift or inheritance.    *Strode v. Commonwealth*, 52 Pa. St. 132; *Eyre v. Jacob*, 14 Gratt. 422; *U. S. v. Perkins*, 163 U. S. 625; *Wallace v. Meyers*, 38 Fed. Rep. 184; *In re Vanderbilt Est.*, 10 N. Y. Sup. 240; *State v. Alston*, 94 Tenn. 680; *Minot v. Winthrop*, 162 Mass. 123; *State v. Hamlin*, 86 Me. 504; *Pullen v. Com'rs*, 66 N. C. 363; Dos Passos on Inher. Tax Law [2 Ed.], sec. 2, p. 5. (4) A provision in the statute making the tax a lien on

property affected by it does not make it a tax on property, or in anywise change the nature of the tax. *State v. Ferris*, 53 Ohio St. 326. The inheritance tax laws of the following States have a provision similar to that in the statute of this State, viz.: Maine, Massachusetts, Connecticut, New Jersey, Maryland and Illinois; in all of which States the constitutionality of the law has been sustained, and the tax was held to be a tax on a privilege and not on property. (5) The act in question does not conflict with section 3, article X, of the Constitution. *First.* The section of the Constitution referred to does not apply to special taxes on privileges. *St. Louis v. Green*, 7 Mo. App. 468; *Glasgow v. Rowse*, 43 Mo. 480; *Express Co. v. St. Joseph*, 66 Mo. 675; *Garrett v. St. Louis*, 25 Mo. 510; *Farrar v. St. Louis*, 80 Mo. 386; *Egyptian Levy Co. v. Hardin*, 27 Mo. 429; *St. Joseph v. Anthony*, 30 Mo. 537; *Adams v. Lindell*, 72 Mo. 198; *St. Joseph v. Owen*, 110 Mo. 455; *Newton v. Atchison*, 31 Kan. 151; *Ex parte Robinson*, 12 Nev. 269. *Second.* If it be held that section 3, article X, of the Constitution does apply to the taxes in question, then we affirm that the statute is not in conflict with that section of the Constitution requiring uniformity. All the taxes imposed by the statute are uniform upon the same class of subjects. *New Orleans v. Kaufman*, 29 La. Ann. 283; *East St. Louis v. Wehrung*, 46 Ill. 394; *Sacramento v. Crocker*, 16 Cal. 120; *Board of Assessors v. Railroad*, 48 N. Y. L. 146; *Minot v. Winthrop*, 162 Mass. 123; *Commonwealth v. Moore*, 25 Gratt. 956. (6) The term "public purpose" can not be clearly defined. It is often difficult to distinguish between purposes of a public and those of a private nature. But the authorities hold that before the courts will declare a tax void there must be an absence of all possible public interest in the purposes for which the tax is levied; and in passing upon the question the courts

give great weight to the legislative assertion. *Booth v. Woodbury*, 32 Conn. 128; *Broadhead v. Milwaukee*, 19 Wis. 624; *State v. Nelson Co.*, 1 N. D. 88; *Speer v. School Directors*, 50 Pa. St. 152; *Schenley v. Alleghany*, 25 Pa. St. 130; *People v. Salem*, 20 Mich. 475; *Gilford v. Supervisors*, 13 N. Y. 143. "If there be the least possibility that making the gift will be promotive in any degree of the public wellfare, it becomes a question of policy and not of natural justice, and the determination of the legislature is conclusive." *Sharpless v. Phila.*, 21 Pa. St. 174; *Booth v. Woodbury*, 32 Conn. 128; *Savings Ass'n v. Topeka*, 20 Wall. 655; *People v. East Saginaw*, 33 Mich. 164; *Tidewater Co. v. Coster*, 90 Am. Dec. 634; *Railroad v. Smith*, 14 Am. Rep. 99; *People v. Marshall*, 1 Gilm. 672; *People v. Hatch*, 33 Ill. 130; *Ex parte McCullom*, 1 Cow. 504; *Thomas v. Leland*, 24 Wend. 65; *Darlington v. N. Y.*, 31 N. Y. 164; *Briggs v. Whipple*, 6 Vt. 95; *Firemen's Fund v. Rome*, 93 N. Y. 313; *People v. Pacher*, 27 Cal. 175; *New Orleans v. Clark*, 95 U. S. 654; *Mount, Trustee, v. State*, 90 Ind. 31; *Long v. Com'rs*, 76 N. C. 280. (7) There is no necessity for notice to interested parties when the property is valued and the tax is levied by the probate court, as the parties have their day in court before the tax can be collected. *St. Louis v. Richeson*, 76 Mo. 470; *Kansas City v. Huling*, 87 Mo. 203; *Bank v. Carswell*, 126 Mo. 436; *Davidson v. New Orleans*, 95 U. S. 42; *Hagar v. Reclamation Dis.*, 111 U. S. 701; *Kentucky R. R. Tax Case*, 115 U. S. 321; *State v. Hamlin*, 86 Me. 504. (8) "Personal property of a resident decedent, whether situated within or without the State, is subject to the collateral inheritance tax law." *Swift Estate*, 137 N. Y. 77; *Est. of Merian*, 141 N. Y. 479; *Strode v. Com.*, 52 Pa. St. 181; *Est. of Knodler*, 140 N. Y. 377; *Miller v. Com.*, 111 Pa. St. 321; *Williamson Est.*, 153 Pa. St.

508. (9) A law may stand so far as it is constitutional, although it has in it certain provisions which are not valid. *State v. Clark*, 54 Mo. 36; *St. Louis v. Railroad*, 89 Mo. 44; *State v. Field*, 119 Mo. 612; *Railroad v. Evans*, 85 Mo. 307; *State v. Pond*, 93 Mo. 635; *Tarkio v. Cook*, 120 Mo. 1; *Garden v. Cornes*, 47 N. Y. 608; *Allen v. Louisiana*, 103 U. S. 80. (10) By the term "clear market value" is meant the actual market value of the estate at the date of the death of the decedent, after first deducting all just and legal demands for which the estate is liable. *Commonwealth v. Cooper*, 127 Pa. St. 440; *In re Millward's Est.*, 27 N. Y. Sup. 286; *In re Line's Est.*, 155 Pa. St. 378.

*Judson & Taussig* also for respondents.

(1) The collateral inheritance tax inposed by section 1 and 1a, is a constitutional exercise of legislative power. (*a*) It does not violate the requirement of uniformity of article X of section 3 of the Constitution of Missouri, and it is not class legislation, for the constitutional power of taxation is vested in the General Assembly. *Glasgow v. Rowse*, 43 Mo. 1; *St. Louis v. Spiegel*, 75 Mo. 145; *St. Louis v. Bowler*, 94 Mo. 630; *St. Louis v. Steinberg*, 79 Mo. 301; *Kansas City v. Whipple*, 136 Mo. 475; Cooley on Tax. [2 Ed.] 170, 171 and notes. (*b*) The constitutionality of inheritance taxation under the same and similar constitutional restrictions has been sustained by the overwhelming weight of American authority. It is not a tax upon property, but upon the privilege of succession. Dos Passos on Inher. Tax Law [2 Ed.], chap. 2, sec. 7 *et seq.; Mager v. Grima*, 8 How. 290; *U. S. v. Perkins*, 163 U. S. 625; *Eyre v. Jacob*, 14 Gratt. 427; *Tyson v. State*, 28 Md. 586; *State v. Dalrymple*, 70 Md. 294; *State v. Hamlin*, 86 Me. 581; *Strode v.*

*Conrath,* 52 Pa. 184; *Orcutt's Appeal,* 97 Pa. 179; *Ridinger's Estate,* 139 Pa. 338; *In re McPherson,* 104 N. Y. 306; *In re Estate of Swift,* 177 N. Y. 77; *Minot v. Winthrop* (1894) 162 Mass. 116; *State v. Alston,* 94 Tenn. 674. The tax has been recently sustained in Illinois (47 N. E. Rep. 321), Montana, and in Ohio (except as to progressive feature). (*c*) The distinction between parents and children on the one hand and collateral kindred and strangers, and the exemption of charitable bequests, are warranted by abundant reasons, and the classification is natural and not arbitrary. *State v. Alston,* 94 Tenn. 674; *Minot v. Winthrop,* 162 Mass. 116. (*d*) The act violates none of the constitutional guaranties of property rights. *State v. Hamlin,* 86 Mo. 507; Dos Passos on Inher. Tax Law [2 Ed.], secs. 22 and 23. Notice is sufficiently secured as necessarily implied in the procedure in the probate court and for the collection of the tax. *Wickham v. Page,* 49 Mo. 529. (2) The act is valid and constitutional and is not repugnant to section 28 of article IV of the Constitution of Missouri, either as to the original or amendatory act. Black on Const. Law, sec. 187, p. 286; Cooley on Const. Lim. 144; *State ex rel. v. Lafayette Co.,* 41 Mo. 39; *State ex rel. v. Co. Court,* 102 Mo. 531; *St. Louis v. Tiefel,* 42 Mo. 578; *State v. Matthews,* 44 Mo. 523; *State v. Miller,* 45 Mo. 495; *State v. Bank,* 45 Mo. 536; *In re Burriss,* 66 Mo. 442; *Hannibal v. Marion Co.,* 69 Mo. 571; *State v. Chambers,* 70 Mo. 625; *State ex rel. v. Ransome,* 73 Mo. 78; *State ex rel. v. Meade,* 71 Mo. 268; *Kansas City v. Payne,* 71 Mo. 159; *State ex rel. v. Laughlin,* 75 Mo. 358; *Ewing v. Hoblitzelle,* 85 Mo. 64; *State ex rel. v. Miller,* 100 Mo. 433; *State v. Bennett,* 102 Mo. 356; *State v. Burgdoerfer,* 107 Mo. 1; *State v. Morgan,* 112 Mo. 202; *State ex rel. v. Bronson,* 115 Mo. 271; *State v. Blackstone,* 115 Mo. 424; *Lynch v. Murphy,* 119

Mo. 183; *State ex rel. v. Co. Court*, 128 Mo. 427; *St. Louis v. Werzell*; 130 Mo. 600; *Wetzman v. Railroad*, 131 Mo. 135; *State ex rel. v. Slover*, 134 Mo. 10; *Ward v. Board of Equalization*, 135 Mo. 309; *State ex rel. v. Heege*, 135 Mo. 112; *State v. Bockstruck*, 136 Mo. 335; *Henning v. Staed*, 40 S. W. Rep. 95; *Luther v. Saylor*, 8 Mo. App. 424. See, also, decisions of other jurisdictions: *Pierce v. Smith*, 29 Pac. Rep. (Ky.) 565; *Morton v. Comptroller General*, 4 S. C. 430; *State v. Madison*, 43 Minn. 438; *Ade v. Newport*, 6 S. W. Rep. 578; *People v. Lawrence*, 30 Barb. 177; *People v. Com'rs*, 47 N. Y. 502; *State v. Bowler*, 72 Ga. 546; *Brewster v. Syracuse*, 19 N. Y. 116; *Trustees v. Railroad*, 30 S. W. Rep. (Ky.) 1; *Bierby v. Road Co.*, 29 S. W. Rep. (Ky.) 34; *Town v. Cabson*, 106 Ill. 300; *Hutchinson v. Self*, 103 Ill. 532; *People v. Mahoney*, 13 Mich. 333; *Montclair v. Ramsdell*, 107 U. S. 147; *Jonesborough v. City*, 110 U. S. 192. (*a*) The Constitution does not require that the title of an act should state the means nor the modes of accomplishing the main purposes of the act. The generality of the title is no objection, so long as it is not made a cover of legislation incongruous in itself. It is sufficient if the title is so comprehensive as to embrace all the matters which are embraced in the subsequent bill and which are germane. (*b*) The act of April 1, 1895, and the title thereof, are in accord with the provisions of section 28, article IV, of the State Constitution. The title is comprehensive and appropriate, and each of the sections is germane to the purpose of the act. Century Dic., title Endowment; Anderson's Law Dic., title Endowment. (*c*) There is but one subject in the act, the endowment of the State university. The establishment and endowment of free scholarships is a recognized form of university endowment. It is immaterial that the word "endowment" is not con-

tained in the body of the act. The body of the act deals with endowment as its subject, and that is therefore a proper comprehensive word for the purpose of the title. (*d*) There is no foundation whatever for the contention that two separate and distinct subjects are contained in the title or in the act. As the endowment of scholarships is an essential function of a university organization, it was entirely proper in one act to include the endowment through the existing seminary fund held by the State, and the endowment through the several counties of the establishment of State university scholarship funds to be maintained and administered in each county of the State. Both are parts of one scheme, for the promotion of the higher education in the State through the endowment of the State university. (*e*) It was not necessary for the title to set out the means and modes by which endowment was to be accomplished, and the title of the act of 1895 was therefore sufficient. The title of the act of 1897 gives this very information. (3) The endowment of the State university by the establishment of free scholarships of merit therein open to those who could not otherwise avail themselves of its opportunities, is a legitimate public purpose for which taxes may be lawfully levied. The university is a State institution, established and maintained for public purposes. It is administered directly by the State, includes the agricultural college and school of mines, established under contract with the general government, with the proceeds of congressional land grants. Act of Cong., June 4, 1812; sec. 14, Ter. Laws Mo., pp. 8 and 13; Act of Cong., Feb. 17, 1818; Enabling Act of Cong., March 6, 1820; 1 Ter. Laws, p. 628, assent of State thereto; 1 Ter. Laws, p. 632; Const. of 1820, art. VI, secs. 1 and 2; Const. of 1865, art. IX, sec. 1, and art. IV, sec. 1; Const. of 1875,

art. XI, sec. 1; Sess. Acts 1838, p. 184; Sess. Acts 1838, p. 133; Sess. Acts 1859-60., pp. 91 and 92; Act. of Cong. of July 2, 1862, for the endowment of agricultural and mechanical colleges; Sess. Acts 1863, p. 34; Sess. Acts 1867, p. 9; Act of February 24, 1870, locating agricultural and mechanical college under endowment of United States; Act of February 1, 1872, making the university free of all tuition charges excepting matriculation fee and incidental charges; Act of March 29, 1872 (Sess. Acts, p. 152), reciting the pledge of the faith of the State and adjusting the Seminary Fund; R. S. 1889, pp. 2010 to 2025; *Head v. Curators of State University*, 47 Mo. 220; *Trustees v. Winsten*, 5 S. & P. (Ala.) 25; *University v. Maultsby*, 8 Ire. Eq. 257; *Weary v. State University*, 42 Iowa, 346; *McDonald v. Hagar*, 7 Black. (Ind.) 525. (4) It is firmly established in American jurisprudence that the higher education is a proper, indeed, one of the primary objects for which public taxation may be levied; and that the extent and manner of such State aid to higher education is for the legislature to determine. Cooley on Tax., p. 70; Story on Const., sec. 1482 and notes; Sedgewick on Const. Law, sec. 414; Cooley on Const. Lim. 182; Adam Smith on "Wealth of Nations," p. 246; Cooley on Tax., pp. 84 and 85; *State ex rel. v. Robinson*, 35 Neb. 410; *Dagget v. Colgan*, 14 L. R. A. 474; *Briggs v. Johnson Co.*, 4 Dill. 448; *Richards v. Raymand*, 92 Ill. 612; *Commonwealth v. Hartman*, 17 Pa. 118; Opinion of Judges, 58 Me. 582; *Booth v. Town of Woodbury*, 32 Conn. 118; *Cushing v. Newburyport*, 10 Met. 509; *Stuart v. School District*, 30 Mich. 69; *Horton v. Mobile School Com.*, 43 Ala. 598. (5) The endowment of universities with free scholarships so that no talent of the community will be debarred from the opportunities afforded,

is now and was at and before the foundation of the university universally recognized as not only a legitimate but a necessary function of the university organization.    Bill of Thomas Jefferson for Better Diffusion of Knowledge, in the Virginia legislature of 1779; Randolph's Early History of Virginia University, p. 426; Letter of Thomas Jefferson of November 25, 1817; 7 Jefferson's Complete Works, p. 93; Letter of James Madison to A. T. Barry, 1822.    Henderson "Jefferson on Public Education," pp. 114, 115, 117; 23 Encyclopedia Brittannica, pp. 837, 838, title Universities; Laurie on Universities, pp. 1, 11, 67, 69, 236; 1 Traill's Social England, pp. 431, 504;  2 Traill's Social England, pp. 61, 65, 66, 231, 228; 3 Traill's Social England, p. 90;  Memorials of Cambridge, Wright & Jones, p. 2.    (a)  This historic function of university organization is based on the obvious fact, true now as in mediaeval times, that students who have sufficient maturity of mind to profit by university ininstruction must have reached years of maturity, i. e. self-supporting years, and therefore the expense of attendance must be defrayed from some source, or much of the deserving talent of the community will be debarred.  In past ages such endowments were furnished by royal or ecclesiastical authority, or by the accumulation of private wealth.  In our country therefore, the founders of our institutions, such statesmen as Jefferson and Madison, deeming the higher education essential to their perpetuity, declared this historic function in university organization peculiarly essential in our American universities, which were founded by the people, and adapted to the conditions of modern industrial life.    (b)  The endowment of free scholarships of merit in a State educational institution is abundantly supported by precedent in this country, both in the federal and State governments.  In the Virginia Military

Institute and in the Louisiana State University, State cadets are educated and maintained at public expense. Code of Virginia, secs. 1574, 1575; Act of March 16, 1870, Laws of La. E. S. 1870, p. 103; Act of July 8, 1886, Laws of La. 1886, p. 164.   (c) In many institutions for higher education in other States, where tuition is not substantially free as in the State of Missouri, scholarships of merit covering tuition fees, etc., are established by legislative authority and the legislature frequently appropriates money for the specific purpose of defraying such tuition charges.   Such State scholarships exist in Cornell University, New York, see Laws of New York, 1894, chap. 556, tit. XII, p. 273. See *People v. Crissey*, 45 Hun. (New York) 19; New Hampshire College of Agriculture, see N. H. Pub. Stat., 1891, chap. 11, secs. 7 and 12; Middlebury College, Norwich University, and the State University of Vermont, see Vermont Statutes, 1894, secs. 865–874; Illinois Universty, see Laws of Ill., 1895, p. 325; University of Wyoming, see catalogue, 1896, 1897, p. 138; Ohio State University, see Report of Board of Trustees, 1896, pp. 41 and 42; Arkansas Industrial University, see act of April 19, 1895, Laws of Ark., 1895, p. 187. (d) In some Sates the holder of a State scholarship, in addition to an exemption from tuition charges, is entitled to receive board and lodging at a reduced rate, or free of charge, and in one case (State College of Kentucky) has his traveling expenses to and from college paid. Ky. Stat. (B. & C.) 1894, secs. 28, 29; North Carolina Code, 1883, secs. 2633, 2634; Annotated Code of Miss. (T. D. & C.) 1892, sec. 21; Catalogue Washington Agricultural College, 1896, pp. 93, 95; Catalogue Florida Agricultural College, 1886, 1887, pp. 28, 36.

GANTT, C. J.—This is an original proceeding in this court for a writ of *certiorari* to the judge of the

probate court of Boone county commanding him to send up the record of his proceedings in the matter of the assessment and levy of a collateral succession tax upon the estate of John C. Conley, late of said county, deceased. The writ was issued and made returnable to Division number 2 of this court, but owing to the importance of the questions involved and the fact that a similar writ had also been issued upon the application of L. R. Wilfley, executor of Susan E. Spear, against Judge Rassieur, judge of the probate court of the city of St. Louis, returnable to the Court in Banc, this cause was transferred to Court in Banc, and the records of the probate court in each case having been removed into this court, the two cases were heard together upon a motion to quash the proceedings for want of jurisdiction in said courts to assess and levy said collateral succession tax.

John C. Conley died in Boone county, Missouri, on the sixth day of December, 1896, leaving an estate consisting of realty in this and other States and of bonds, notes, certificates of stock, and other securities. His will, dated February 18, 1896, was duly established and admitted to probate by the probate court of Boone county on the seventh of December, 1896. The said testator was never married. He made a bequest of $20,000 for charitable purposes and gave the remainder of his estate in different amounts to his collateral relatives. He gave some special legacies of a certain amount and after the payment of various special bequests the residue of the estate is given by his will to certain nephews and nieces named in the residuary clause. Letters testamentary were duly issued to the relators, who qualified as executors of the will on the fifteenth of December, 1896, and filed their inventory on the eleventh of January, 1897.

The probate court, on the thirtieth of August,

1897, entered an order of record, reciting the death of said John C. Conley and the probating of his will, and setting out the terms thereof, the date of letters testamentary and of the filing of the inventory, and over the protest of the relators (who waived formal notice of the proceedings, but objected to the right of the court to make such assessment), proceeded to fix the value of said estate, for the purposes of the collateral succession tax, under the act of April 1, 1895, and the amendatory acts of 1897. The court found that the sum of $20,000 was given by the will to trustees for charitable purposes; $18,391.31 of the estate will be required to pay the debts of the testator (so far as appeared up to the date of that order), and other legal demands; that the real estate in the State of Missouri was of the value of $45,660, and that the personal property of the estate was of the value of $182,919.34, making a total valuation of $228,579.34. The court deducted from this amount, the sum of $20,000 given for charitable purposes, and $18,391.34 required to pay debts and expenses of the administration, and held and determined that the clear market value of all of said property, subject to such tax, was $190,188; and that said amount was subject to the payment of a collateral succession tax of $5 for each and every $100 of such sum up to $10,000, and $12.50 for every $100 in value in excess of said sum of $10,000. Eighty-five shares of stock in the bank of Hico, Texas, of the par value of $8,925 was included in the above valuation. The court then levied and charged said estate with a total tax of $23,023.50 and ordered the executors to pay the same. All these facts appear upon the face of the record of the probate court. A similar state of facts exists as to the tax on Susan E. Spear's estate, in all material respects.

The constitutionality of the act of the General

Assembly of Missouri entitled "An act providing for the endowment of the State University, and for the establishment and endowment of free scholarships of merit therein in each county," approved April 1, 1895, and of an act of the General Assembly entitled "An act to amend an act passed by the Thirty-eighth General Assembly of the State of Missouri entitled 'An act providing for the endowment of the State University and for the endowment of free scholarships of merit therein in each county;' by adding a new section after section 1 of said act to be numbered section 1a, which new section shall read as follows," approved March 16, 1897, is directly assailed in and by these proceedings. The proposition of relators is that both the act of April 1, 1895, and the amendatory act of March 16, 1897, are void because in conflict with various provisions of the Constitution of Missouri and the fourteenth amendment to the Constitution of the United States.

No question is raised as to the power of this court by *certiorari* to supervise the proceedings in the probate courts, and if their action in levying said taxes is found to be in excess of their powers, to quash their proceedings, and we have no doubt of our power to do so.

At the risk of being deemed prolix we will insert so much of the acts as bear directly upon the questions raised. The act was passed in 1895, and amended by two acts passed in 1897. As amended it provides, among other things, as follows:

Sec. 1. That all property conveyed by will, or by the death of an intestate, to any person other than the father, mother, husband, wife or direct lineal descendant of the testator or intestate, except property conveyed for some educational, charitable or religious purpose exclusively, shall be subject to the payment

of a collateral succession tax of $5 for each and every $100 of the clear market value of such property.

Sec. 2.	That in addition to the fees now provided by law no corporation shall be organized under the laws of this State, and no foreign corporation shall do business in this State, unless the incorporators shall, upon filing the articles of association, pay to the State treasurer, in trust for the State of Missouri, to be disposed of as hereinafter provided in this act, the sum of twenty-five hundredths of a dollar for every thousand dollars of the capital stock of such corporation as a franchise fee; and a like franchise fee shall be paid in the same manner on every thousand dollars of the increase of the capital stock of any corporation.

Sec. 3.	That every manufacturer of patent medicines shall annually pay a license tax of twenty-five dollars.

Sec. 4.	That all moneys, which may hereafter escheat to the State shall be distributed in the manner provided by this act.

Sec. 5.	That all taxes, fees or moneys received under this act by any county official shall be paid during the first week of the following month to the county treasurer, who shall credit three fourths to a fund hereby created to be known as "The State University Scholarship Fund," and remit the remaining one fourth to the State treasurer; and from all money received directly by the State treasurer under this act, he shall monthly reserve one fourth and remit the remaining three fourths to all the county treasurers of the State, to be credited to "The State University Scholarship Fund" of such counties.

Sec. 6.	That all moneys received by the State treasurer to be retained by him under this act shall be deposited in the State treasury to the credit of the "seminary fund" as provided by law.

Sec. 7.   That all moneys received by the county treasurer of each county to be credited to "The State University Scholarship Fund" shall be forever kept and preserved as a sacred permanent fund, and shall be invested and loaned in the manner provided in this act.

Sections 8, 9 and 10 of the act are in the following words:

"Sec. 8.  The income of the moneys in 'The State University Scholarship Fund' shall be collected annually, and one fourth of the same added to the principal, and the remaining three fourths shall be faithfully appropriated for establishing and maintaining free scholarships in the State university, the amounts and terms of which shall be fixed and changed from time to time, as may be necessary, on the written order and resolution of the board of curators of the State university.

"Sec. 9.   On the first week of August of each year, beginning with the first Monday after due notice thereof, as prescribed by the county court, in two newspapers of each county, representing different political parties where such newspapers exist, there shall be held at the courthouse in the county seat, an examination of all applicants qualified under the law to be students of the university.   Such applicants shall be actual residents of the county, and such examinations shall be conducted by three examiners, one of whom shall first be appointed by written notice to the county clerk by the president of the board of curators of the university during the month of July, and one selected thereafter by the county court of another political faith, and the third selected by the agreement of the two so chosen, with power in the county court, or the presiding judge thereof in vacation, to fill all the vacancies in the position of examiner; and such examination shall be writ-

ten, and shall meet the requirements for entrance in the academic department of the university. *Provided*, that the duties imposed on county courts or the judges thereof, by this section, shall be discharged in the city of St. Louis by the mayor.

"Sec. 10.   Those applicants passing the best and most meritorious examinations, to the number of scholarships established in each respective county, shall be awarded such scholarships, and be entitled thereon to enter free of matriculation fees, any department, school or college of the university, *and have paid to them in equal monthly instalments while attending the university, the sum provided by the scholarship so awarded, for defraying the expenses of such attendance. Provided, that no applicant shall be qualified to receive such scholarship unless such examiners shall be satisfied that the applicant is dependent upon his own exertions for his education, and financially unable to otherwise obtain the same.*"

By comparison of the act thus revised and amended in 1897 with the original act of 1895, it will be seen that the progressive feature of the original act, to wit, the increase of seven and one half per cent on amounts of over $10,000, is repealed and specific provision is added for valuation of inheritances and enforcing the collection of the tax.   Amendments are also made to sections 2 and 3 in matters not material in the present proceeding, while in section 5, the distribution of the funds collected by the State treasurer in trust under the provisions of the act is so regulated that it is made in the different counties on the basis of representation in the General Assembly.

Lying at the threshold of this discussion is the objection which goes to the very substance of this enactment.   It is insisted that the tax provided in the act is not levied for a *public purpose* within the mean-

ing of section 3 of article X of the Constitution of Missouri, which ordains that "taxes may be levied and collected *for public purposes only.*" This provision of our Constitution accords with the definition of a tax as expounded by the courts and law-writers of this country. Judge COOLEY in his work on Constitutional Limitations, p. 587, says, "taxes are burdens or charges imposed by the legislature upon persons or property to raise money for public purposes." Judge COULTER, in *Northern Liberties v. St. John's Church*, 13 Pa. St. 104, said: "I think the common mind has everywhere taken in the understanding that taxes are a public imposition, levied by authority of the government for the purpose of carrying on the government in all its machinery and operations, that they are imposed for a *public purpose.*" The Supreme Court of the United States in *Loan Association v. Topeka*, 20 Wall. 655, in a luminous opinion by Judge MILLER, after a review of the authorities and a discussion of the power to tax, laid it down as an established principle that "beyond cavil there can be no lawful tax which is not laid for a *public purpose.*" In the *Matter of the Mayor of New York*, 11 John. 80, the court said: "The word 'taxes' means burdens, charges of impositions put or set·upon persons or property for public uses, and this is the definition which Lord Coke gives to the word 'talliage' (2 Coke Ins. 532), and Lord Holt in Carth, 438, gives the same definition in substance of the word tax." Chief Justice APPLETON in *Allen v. The Inhabitants of Jay*, 60 Me. 124, says, "A tax is a sum of money assessed under the authority of the State on the person or property of an individual *for the use of the State.* Taxation by the very meaning of the term implies the raising of money for public use and *excludes* the raising if for *private objects and* purposes." Judge JERE BLACK, in *Sharpless v. Mayor*, 21 Pa. St. 167, says: "I concede that a law authorizing

taxation for any other than a *public purpose is void.*"
We construe section 3 of article X of our Constitu-
tion as a direct inhibition upon the General Assembly
to levy a tax for a private purpose, or for the benefit of
any private individual.    The language used is not sus-
ceptible of any other construction.

We shall assume without further comment that if
the act under review authorizes the levy of a tax, that
tax must be for a public purpose, otherwise it is a direct
violation of the Constitution of this State. .Does it
authorize a tax?   The learned counsel of the probate
judges argues that it is not strictly a tax.  He says:
"Although called a tax it is not properly so, but a bonus
or price exacted from the collateral kindred and stran-
gers to the blood as the condition upon which they take
the estate whose owner is dead."   But even if such
a distinction can be maintained, the contention
does not reach the vital point upon which the relators
insist, namely, that by whatever name this burden, or
excise, tax, bonus or exaction from the citizen, may
be called, still it falls within the purview of the word
"taxes" as used in the third section of article X of our
Constitution.   The word in that section is used in its
generic sense as expounded by lexicographers, judges
and lawyers long before its use in our organic law.   In
the sense that *taxes* can be levied *only* for a *public pur-
pose,* that word includes every character and kind of
tax, general or special.   The power of the State to
demand such a bonus is referable, and referable only, to
the taxing power, so that whether this "collateral suc-
cession tax" as it is denominated by the legislature, be
termed a tax or a bonus, an excise, a price imposed for
the privilege of taking an estate by will or inheritance,
it must be levied or exacted for a *public purpose only*
under our Constitution, and under those limitations on
the taxing power which exist in the very nature of our

free institutions.   Miller on the Constitution of the United States, 242.   Outside of express constitutional inhibitions there are limitations upon the powers of every branch of our governments, State and Federal. Every branch has its limitations short of absolute power.   The Supreme Court of the United States expressed it in these words:   "No court would hesitate to declare void a statute which enacted that A. and B. who were husband and wife to each other, should be so no longer, but that A. should thereafter be the husband of C., and B. the wife of D.   Or which should enact that the homestead now owned by A. should no longer be his but should henceforth be the property of B."   *Loan Association v. Topeka, supra.*   And in the same case, the court further said: "To lay with one hand the power of the government on the property of the citizen and with the other to bestow it upon favored individuals to aid private enterprises and build up private fortunes, is none the less a robbery because it is done under the forms of law and is called taxation.   This is not legislation.   It is a decree under legislative forms."

That the State of Missouri for public purposes may assess and levy taxes upon the succession or devolution of property under our inheritance laws or statute of wills, subject only to the prohibitions of the Constitution of the State and the Constitution of the United States, we have no doubt whatever.   The constitutionality of such a tax has been too long affirmed by the courts of last resort to admit of doubt, but we have not found nor have counsel pointed to any statute which has received the sanction of the courts, which levied such a tax for other than a plainly public purpose.   Is the purpose for which the act in question authorizes this collateral succession tax a public one? Perhaps few branches of the law have been more carefully considered than that which this inquiry suggests.

The duty and power of imposing taxes is a legislative one and the presumption is and must be that the legislature will levy a tax only for a public purpose, and the courts are justified in· interposing only when it clearly appears that the Constitution, which is the supreme law governing both the legislature and the courts, has been or will be violated by the enforcement of the legislative purpose.    What is and what is not a public purpose is not always easily determined. The Supreme Court of the United States in *Loan Association v. Topeka*, 20 Wall. 655, states the rule to be, that "In deciding whether in a given case, the object for which the taxes are assessed falls upon the one side or the other of this line, the courts must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal.    Whatever lawfully pertains to this and is sanctioned by time and acquiescence of the people, may well be held to belong to the public use and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation."    The Supreme Court of Michigan, in *The People v. Salem*, 20 Mich. 452, with signal ability and thoroughness discussed this question and came to the conclusion that "the term 'public purpose' as employed to denote the objects for which taxes may be levied, has no relation to the urgency of the public need, or to the extent of the public benefit which is to follow.    It is, on. the other hand, a term of classification to distinguish the objects for which, according to settled usage, the government is to provide, from those which by the like usage are left to private inclination, interest or liberality."

How these general principles have been applied, reference to the judgments of the courts will best determine. In *Loan Association v. Topeka*, 20 Wall. 655, a statute of the State of Kansas, which authorized a town to issue its bonds in aid of the manufacturing enterprise of private individuals, came before the Supreme Court of the United States, and it was held void because the taxes necessary to pay the bonds would if collected be a transfer of the property of individuals to aid in the projects of gain and profits of others, and not for a public use in the proper sense of these words. In *Allen v. Jay*, 60 Me. 124, a town at a meeting legally called voted to loan its credit to a firm to the amount of $10,000 and issue its bonds for that sum, provided the firm would invest $12,000 to $13,000 in a steam saw mill with a run of stone to grind meal and maintain it for ten years and the legislature afterward passed an enabling act authorizing said loan, but the Supreme Judicial Court held the act unconstitutional and void because not for a public use. All the buildings on a very large portion of the city of Charleston, South Carolina, having been destroyed by fire, the city council passed an ordinance providing for the issue of bonds by the city to be loaned the owners to build and rebuild the waste places and burnt districts. The legislature afterward, by an act reciting the ordinance, fully confirmed and authorized the issue of said bonds, known as "fire loan bonds," and certain persons bought them. Afterward suit was brought against the city to collect them but the Supreme Court of the State held said bonds were issued for a private purpose and void; that the taxing power could only be exercised for some public purpose. In November, 1872, a great conflagration swept over a large portion of the city of Boston. The legislature of Massachusetts passed an act authorizing

the city of Boston to issue bonds and loan the pro-
ceeds on mortgages to the owners of the land to enable
them to rebuild their houses.  The Supreme Court
held the act void; that it was not for a public object
in a legal sense.

In *Curtis's Adm'r v. Whipple*, 24 Wis. 350, the
legislature empowered the town of Jefferson to raise a
sum by taxation to be paid to the treasurer of "The Jeff-
erson Liberal Institute," a private educational institu-
tion, but the Supreme Court held the act void, the tax
being for a private purpose, and a like conclusion was
reached in *Jenkins v. Andover*, 103 Mass. 94.  This
court in *Deal v. Mississippi Co.*, 107 Mo. 464, held sec-
tion 5697, Revised Statutes 1879, void because it gave
a bounty to private individuals for growing forest trees
upon their own lands.  In each and all of these cases
it was held that the fact that the public might be inci-
dentally benefited by rebuilding a burnt city and by the
establishment of manufactories and schools, would not
sustain the tax.  Every factory, every private school or
academy, every industrial enterprise which furnishes
opportunity for labor and the earning of wages bene-
fits a community in one sense, but the *indirect* good
which inures in this way furnishes no basis for taxation
of other business to build up such occupations.
Learned counsel for the respondents do not seriously
controvert this general proposition, but meet it with
the assertion that the State university is a State institu-
tion established and maintained for a public purpose.
This is at once conceded by the relators because the
people of Missouri in their sovereign capacity have rec-
ognized and declared in their organic law that "a gen-
eral diffusion of knowledge and intelligence is essential
to the preservation of the rights and liberties of the
people," and imposed upon the legislature the duty of
establishing and maintaining "free public schools for

the gratuitous instruction of all persons in this State between the ages of six and twenty years.'' Art. XI, sec. 1, Constitution, 1875. Moreover, by section 5 of article XI of the Constitution, the General Assembly is enjoined, whenever the public school fund will permit and the actual necessity of the same may require, ''to aid and maintain the State university now established with its present departments.'' By section 6 of the same article of the Constitution a fund is provided, ''the annual income of which, together with so much of the ordinary revenue of the State as may by law be set apart for that purpose, shall be appropriated for the maintenance of the free public schools and the State university.'' If, then, this collateral succession tax is levied to support the State university unquestionably it is for a public purpose.

At this point, however, the real contention in this case arises. Relators insist that the fund sought to be accumulated by this tax is not a provision for the support of the university, but is a tax to raise a fund the proceeds of which must be paid to certain favored individuals to enable them to buy food and clothing for their own use while pursuing their studies at the university. The controversy must be determined by the act itself. By reference to the summary of its various sections as hereinbefore set out, it will be observed that three fourths of all the moneys raised by this tax was intended to create ''the State university scholarship fund'' of the several counties of this State to be kept as a permanent fund to be invested so as to bear interest. This interest is to be collected annually and one fourth of it added to the fund and the remaining three fourths to be appropriated for establishing and maintaining free scholarships in the university, the amounts and terms of which are to be fixed by the curators of the university. By sections 9 and 10 provision is made for

competitive written examinations on the first week of August in each year, of actual residents of each county who shall meet the requirements for entrance in the academic department of the university, provided however that no applicant shall be eligible to receive such free scholarship unless the examiners "shall be satisfied that the (said) applicant is dependent upon his own exertions for his education and financially unable to otherwise obtain the same." Having thus determined who may be the beneficiaries of this tax and segregated them from the great mass of citizenship, and awarded them these free scholarships, section 10 of the act provides "they shall be entitled to enter thereon free of matriculation fees any department, school or college of the university *and have paid to them in equal monthly installments while attending the university, the sum provided by the scholarship so awarded for defraying the expenses of such attendance.*"

Deferring for the present any discussion of the proposition that one fourth of the tax may be sustained because it is directed to be paid into the State treasury for the benefit of the "seminary fund," an admitted public use, we direct our attention to the arguments for and against the "free scholarship fund." It is perfectly evident we think that no distinction can be maintained between the fund and its annual increment. It can not be true that this fund is a state or public fund under this act while the whole beneficial use and interest arising therefrom is private. Such a distinction is illogical and unsound. The fund is created for the sole purpose of producing the interest to be derived from it and it is incredible to believe that the legislature would have provided the tax at all if it was not to obtain the interest to be used for the maintenance of the scholars. The fund and the interest are inseparable.

Counsel for the curators urge that this statute can only be properly construed by keeping in view "the historical setting" of the university and "its historical genesis." They assert that university education is a proper, indeed one of the primary objects, for which public taxation may be levied, and that the extent of such taxation in aid of higher education is for the legislature alone to determine; that the Constitution having established free public schools and the university, the legislature can go further and furnish free support of the children while attending these schools and the university. It is true that the learned counsel for the curators are not altogether in harmony on this proposition. Some of the learned counsel for the curators boldly argue that if the legislature can furnish free scholars and free teachers, why can it not go further and furnish a free support to the children who attend these schools if that is deemed necessary to make the system a success, whereas their colleague draws the line at the free support of the students of the university and denies the right to furnish free living to the children attending the common schools, "because the law recognizes and enforces the parental obligation of support during the period of elementary education." Some of the learned counsel for the curators admit that such a support of the students is paternalism in its most pronounced form, but say it is *"not of a hurtful or dangerous kind; that is only paternalism of the State, not of the Federal government."* Paternalism, whether State or Federal, as the derivation of the term implies, is an assumption by the government of a quasi-fatherly relation to the citizen and his family, involving excessive governmental regulation of the private affairs and business methods and interests of the people, upon the theory that the people are incapable of managing their own affairs, and is

pernicious in its tendencies. In a word it minimizes the citizen and maximizes the government. Our Federal and State governments are founded upon a principle wholly antagonistic to such a doctrine. Our fathers believed the people of these free and independent States were capable of self-government; a system in which the people are the sovereigns and the government their creature to carry out their commands. Such a government is founded on the willingness and the right of the people to take care of their own affairs and an indisposition on their part to look to the government for everything. The citizen is the unit. It is his province to support the government, and not the government's to support him. Under self-government we have advanced in all the elements of a great people more rapidly than any nation that has ever existed upon the earth, and there is greater need now than ever before in our history of adhering to it. Paternalism is a plant that should receive no nourishment upon the soil of Missouri. While the exigencies of this case may require the operation of such a principle we are sure its germs are not to be found in the Constitution of this State, nor in the spirit of its people. Whatever other fault the Constitution of 1875 may have, it is certain that its framers sought most sedulously to curb the power of those clothed with authority to legislate in behalf of favored classes, and to leave the people the largest possible control over their own affairs. Especially has the power of taxation been jealously hedged about and limited. The same authority is found in the Constitution to levy taxes to clothe and feed the children who may desire to attend the free public schools as there is to raise money by taxation to be handed over to young men and young women to be used by them in supporting themselves while they acquire what is

termed "the higher or university education," *but we find no warrant for either in the organic law of this State*, or in the character of our government.

It is one thing to provide for the establishment and maintenance of a State university, and a system of free public schools, the State through its own officers, agencies and municipalities constructing and owning the buildings and apparatus and employing the teachers as public functionaries, responsible under her own laws for the discharge of their duties; and a wholly different thing to support private individuals who attend the university and public schools by public taxation. But it is said that nothing is more common than the endowment of free scholarships as a part of the endowment of a university. This may be true of the universities of Europe, and individual instances are to be found in this country, where some great benefactor of the race has out of his own bounty provided such scholarships, but these examples furnish no guide to the free States of this Union, clearly not to the legislature of Missouri under its organic law. The act under consideration endows the scholar, not the university. It provides in unmistakable terms that a fund shall be raised by taxation and paid over to students attending the university for *their support* while so engaged. It is a pure and simple gift of public money by the State to private individuals for their own private use in plain violation of section 46, article IV of the Constitution, which prohibits the legislature from granting "public money to any individual, association of individuals, or other corporation whatsoever." We hold that when the Constitution provided for the establishment and maintainance of the university, it conferred authority to support an institution belonging to the State, and this grant is not to be extended to the *unlimited support* of the *pupils* who may

attend or desire to attend that school.   In obedience
to the mandate of the Constitution, the legislature has
made generous provision for the university and public
schools, and the opportunities for education are com-
mensurate with the greatness of the commonwealth,
and the needs of the people.   Neither the Constitution
nor a sound public policy demands that the State should
indirectly stifle all motive for individual effort and
laudable ambition.   Free common schools adorn every
school district in the State.   Splendid normal schools
are distributed to its different sections, and the doors
of the university are practically opened to every
thrifty, energetic young man and woman in the State.
The State has not been niggardly with its children;
every proper stimulus is set before them.   But here
she stops, and says to the citizen, the right to lay
further burdens for your private benefit is exhausted.
Under equal and just laws, by your own self-reliance
and energy, you must win the rewards of labor and the
honors of the State.

It is only necessary to add that counsel for the
curators do not attempt to maintain this tax on the
theory that the young men and women who would
obtain these scholarships are paupers in the meaning
of the law.   Even without this admission, it is per-
fectly apparent that the act by its terms does not con-
fine this pension to the children of poor persons who
may in a legal sense be denominated paupers.   The class
of ambitious young men and women who could avail
themselves of the benefits of this act would resent
such a designation and scorn this proffered aid if to
obtain it they must first be classed as paupers.   It is
perfectly clear that the tax is not levied upon any such
principle.   If it were, it would collide with another
fundamental principle.   It would be class legislation.
Says Judge COOLEY in his work on taxation, page 121:

"To justify taxation for the purpose of education, the rules under which the people shall be admitted to the privileges given must not be invidious and partial, but must place all parties on a plane of practical equality. The rule is substantially the same here that applies in the apportionment of taxes; equality must be the aim of the law, and it must be assumed that the State has no special favors to bestow upon privileged classes. . . . It would not be competent to single out some one class of the community and exclude them from the benefits of the public schools on arbitrary grounds."

Our conclusion is that this tax is levied for a purely private purpose, and for that reason it is in contravention of the Constitution of Missouri.

This tax is assailed in another vital point. Relators assert it is void for want of uniformity. John C. Conley, one of the testators, died on the sixth day of December, 1895. His will was probated February 18, 1896. Susan E. Spears, the other testator, died June 10, 1896. It is essential that we determine whether the act of 1895 or that of 1897 governs. Is the tax to be levied under the act of 1895, if valid, or the act of 1897, which was enacted long after the death of both of these testators? There is nothing in the act of 1897 which gives it a retrospective operation, and if there was, it would be in direct conflict with the Constitution of Missouri, which prohibits retrospective legislation. We think it must be plain that the act of 1895, adopted prior to the death of these testators, if valid, must control and not the act of 1897, enacted after their deaths. This, we take it, is the usual construction. By the terms of each the devolution of the property and the right of the State to tax accrues immediately upon the death of the testators. *In re Seaman's Estate*, 41 N. E. Rep. 401; *In re Embury's Estate*,

45 N. Y. Sup. 821; *In re Estate of Roosevelt*, 25 L. R. A. 695; Const. of Mo., art. II, sec. 15; *Leete v. Bank*, 141 Mo. 584.

Looking to the act of April 1, 1895 (Laws of Mo. 1895, p. 278), for authority for this tax, we are met with the objection that this tax is also void because the said act is in violation of section 3 of article X of the Constitution of Missouri and of the fourteenth amendment to the Constitution of the United States, and section 4 of article X of the Constitution of Missouri.

Of these in their inverse order. As already remarked no doubt longer exists that it is competent for the legislature to levy a tax upon the succession of estates. It is quite universally held that such a tax is not a tax upon property in the ordinary sense, but is in the nature of an excise, or bonus, exacted by the State upon the privilege or right to inherit or succeed to an estate. It is not necessary at this time to enter upon an examination of the extent of this right on the part of the State, nor to approve or disapprove the extreme views expressed by some of the courts. While conceding the right to tax, our duty now is to ascertain if we can, what was the purpose of the legislature in enacting this law. A primary and safe rule of interpretation of a statute is to endeavor to gather the legislative intent from the words they used. *Gardner v. Collins*, 2 Pet. (U. S.) 93; *Brewer v. Blougher*, 14 Pet. 178. The General Assembly has declared that it intended to levy a "collateral succession tax" and we all agree that by whatever name this exaction may be called it is referable to the *taxing* power of the State. The controlling question is, upon what did it authorize that tax to be levied, upon the property or estate of the deceased person, or upon the right or privilege of his beneficiaries to receive his estate by inheritance or devise? If upon the latter, it is settled by the great

weight of authority that it does not fall within the regular ordinary taxation upon property, which our Constitution requires shall be in proportion to its value. Recurring then to the language of the act of 1895, we find that the ordinary machinery, so to speak, was not prepared for enforcing the act of 1895, as for enforcing other delinquent taxes. It ordained that a, tax of $5 for each and every $100 of the clear market value of such property, where the money or property shall be $10,000 or less in value, and where the money or property affected exceeds $10,000 in value the same shall be subject to a tax of $5 for each and every $100 of the clear market value thereof up to and including $10,000 in value, and a tax of $7.50 in addition for every such $100 in value in excess of $10,000, and gave a *first lien upon the property affected*, but provided no method of valuation. The mode of procedure was amended in 1897 by providing a means of ascertaining the value of such estates which had been overlooked in the act of 1895, and a new section to be known as section 1*a*, which provides that it shall be the duty of the judge of the probate court in this State, whenever the inventory and appraisement *of any estate is filed*, which is subject to the payment of a collateral succession tax, to immediately levy upon and charge *such estate with the amount of such* collateral succession tax, and require the executor, administrator or beneficiary to pay the same, etc.

A "succession tax," as the words indicate and the history of such taxes clearly establishes, is an excise or duty upon the right of a person or corporation to receive property by devise or inheritance from another under the regulation of the State. Wherever properly laid, this is its distinguishing feature in contradistinction from a property tax. The language of these two acts of 1895 and 1897 is very much involved, and more

or less doubt must be felt in interpreting the meaning of the legislature, and this is true of other acts in other States. When it is clear that the tax is upon the succession it is computed, not on the aggregate valuation of the whole estate of the decedent, considered as the unit for taxation, but on the value of the separate interest into which it is divided by the will or by the statute laws of the State, and is a charge against each share or interest according to its value and against the person entitled thereto.'' That is to say, it is a burden on each person claiming succession, measured by the value of his interests and collectible out of his interest only. Accordingly in New York, after whose statute the act in question seems to have been in several respects patterned, great difficulty was experienced in construing the law, but the act being sustained as levying a succession tax, it was ruled in the matter of *Hoffman's Estate*, that when the will created contingent estates the executors could not pay the tax until the expectancies became fixed and actual; in other words, being a tax upon the person receiving the share of the estate, it did not accrue until that person was finally ascertained, and that the State could only get its taxes when the legatees or devisees obtained their property. *Hoffman's Estate*, 143 N. Y. 327. And in the matter of *Roosevelt*, 143 N. Y. 120, in answer to the contention of counsel for the State that while it might be considered a hardship to compel annuitants to pay a tax upon an interest that they might never receive, it was the fault of the statute and the tax could only be postponed by giving bond, the court of appeals answered: ''This contention admits away the entire case of the State. It is not to be assumed that the legislature intended to compel the citizen to pay a tax upon an interest he may never receive.'' Until the vesting of the estate ''the power to tax does not exist.''

It is obvious that the tax is upon the transfer by will or devolution by inheritance, and in the absence of a transfer and a transferee there is no basis for a succes- sion tax in its true sense, as it comes to us in the history of jurisprudence and of nations. With these essential characteristics in view, can the acts of 1895 and 1897 be said to have levied a *succession tax.*

Section 1*a* requires the tax to be levied upon the appraised value *of the whole estate left by the deceased.* The tax is at once levied upon that estate, and the per- sonal representatives of the deceased, *not the devisees and legatees,* are required to pay the tax. How such a tax differs from general taxes upon the property of the deceased under our system we are not able to state. The mere calling of such a tax a succession tax does not make it different from an ordinary tax upon prop- erty when the effect and operation are identical with an ordinary property tax. This tax is collectible out of all property devised by will or descending to any person other than the father, mother, husband, wife or direct lineal descendant, whether the estate of the ancestor, devisor or grantor is solvent *or insolvent.* If insolvent there is nothing to which the heir or devisee or legatee can succeed, and yet upon the theory of a succession an onerous tax is added to the charges against an estate and payable in advance of other claims. The language of the Supreme Court of Wisconsin in *State ex rel. v. Mann,* 76 Wis. 478, seems exceedingly appropriate upon this point: "A succession tax would necessarily be imposed upon the respective parties thus succeeding to such residue. But the tax in question is not upon such succession *but upon the whole estate* at its appraised valuation, regardless of whether it is solvent or insolv- ent. In case of an insolvent estate, nothing would be left after the payment of debts for transmission, and in most estates there are likely to be sufficient debts to

reduce the amount of transmission far below the amount of such valuation. Besides, the amount of such tax is graduated by the amount of such appraisal and is to be paid by the executors or administrators before or at the time of filing such appraisal, notwithstanding they may only be interested as such officials and never succeed to any of such estate. Manifestly, the burden imposed is not a succession tax, but a tax upon the whole estate, regardless of whether it is solvent or insolvent." The New York act (Laws 1896, chap. 908, sec. 225) provides *for a refunding of a proportionate part of the tax in case debts are allowed after its payment,* and it was owing largely to this provision that that act was sustained, but no such provision is found in our acts of 1895 and 1897. *In re Westburn's Estate,* 46 N. E. Rep. 315.

We think the language of this act, whatever conjecture we may indulge as to the intention of its author, imposes a tax directly upon the property of the decedent, and not upon those who may succeed to his estate, and it must be conceded that if it is a property tax it is unconstitutional because it subjects this estate to an additional property tax to that levied upon all other like property in the State for the same year, and is not levied in proportion to its value.

But in no event can the act of 1895, which governs these two cases be upheld, because the tax authorized by it is not "uniform upon the same class of subjects within the territorial limits of the authority levying the tax." Section 3, article X, Constitution of Missouri. The class of subjects to be taxed under this act is the succession or inheritance of property by collateral kindred or devisees other than those named in the statute as exempt from its imposition. It is not necessary to determine what would or would not be proper classification under this act in all cases, but it

is perfectly clear that when the tax is levied upon the property as under this act, uniformity is only attainable by levying the same per cent upon all property belonging to persons bearing the same relation to the decedent. A law which levies five per cent upon one cousin or uncle whose legacy is $10,000, and five per cent upon the first $10,000 of a legacy of $20,000 bequeathed to another cousin of the same degree, and twelve and one half per cent upon the remaining $10,000 thereof, violates the constitutional principle of uniformity. It is an arbitrary classification without rhyme or reason. Such was the decision of the Supreme Court of Ohio in *State ex rel. Schwartz v. Ferris*, 53 Ohio St. 314, 30 L. R. A. 218, upon a provision of the Constitution of that State substantially like section 3, article X, of the Constitution of Missouri.

It is significant that in New York, Maine, Maryland, Virginia, Pennsylvania and Massachusetts, in which inheritance taxes are sustained, the statutes only authorize a uniform rate of taxation. The constitutional guarantee of uniformity upon the same class of subjects would avail but little if the legislature can arbitrarily vary the classes as often as the amount of property devised or transmitted by inheritance shall differ. If such a rule obtain, the classes will be innumerable, and the Constitution a dead letter. Where the amount of property received is made the basis of the tax, uniformity can only be attained by levying the same per cent upon the property of each beneficiary under the will or by inheritance. While the legislature might perhaps distribute the collaterals according to the different degrees of kinship to the decedent or testator or grantor, and levy a different rate upon the different degrees, yet when it ignores all such natural classification and makes the amount of

money received by each the test of classification it runs counter to another principle that is well nigh universally accepted that a uniform rate of taxation upon every man's property secures equality of burden. To levy a different rate simply because the amount of each man's holdings is different would produce favoritism and destroy that principle of equality before the law which is the boast of free government. If it be urged that the one receiving the larger bounty enjoys a greater privilege, still the principle of uniformity answers that the value of his right to receive is in direct proportion to the value of the property to which he succeeds, and must, if taxation is to be uniform, be taxed in that proportion or according to one common rate. In *State v. Hamlin*, 25 L. R. A. 632, the Supreme Court of Maine in upholding a tax consisting of a uniform per cent, said: "The constitutional requirement of uniformity is satisfied by a tax on the transmission of property by will or descent to strangers and collaterals *when it is uniform as to the entire class affected*, although other classes of persons are exempted from the tax." See, also, *R. R. Tax Cases*, 13 Fed. Rep. 722.

Other grave objections are made to the act, one challenging its title as containing two distinct subjects; another that the various subject-matters found in the body of the act are not indicated at all in the title. These objections have been presented with the greatest ability and have been duly considered, but inasmuch as the propositions already decided go to the very substance of the act we deem it unnecessary to pass upon the point as to the title of the act. To respond to the very thorough discussion of the point by counsel would extend this opinion unnecessarily to too great length.

The act of 1895 must be held void, and it follows that the probate courts of Boone county and of the

city of St. Louis, were wholly without jurisdiction to levy the taxes upon the estates of John C. Conley and Susan E. Spear, and their proceedings in that behalf must be quashed, and it is so ordered. SHERWOOD, BURGESS, ROBINSON and BRACE, JJ., concur; WILLIAMS and MARSHALL, JJ., having been of counsel, take no part in the decision of the case.